**FEDERAL CEMENT TILE COMPANY,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

No. 14588.

United States Court of Appeals
Seventh Circuit.

Oct. 23, 1964.

Rehearing Denied Dec. 16, 1964.

Thomas Eugene Foster, Thomas J. Boodell, William J. Kilbridge, Robert S. Robin, Chicago, Ill., Nelson, Boodell, Foster, Sugrue & Crowley, Chicago, Ill., of counsel, for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Tax Div., Robert J. Golten, Lee A. Jackson, I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before CASTLE, KILEY and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

This review of a Tax Court decision concerns corporate income tax deficiencies totaling approximately $621,000. The correctness of the decision depends upon an interpretation of the loss carryover provisions under the 1939 Internal Revenue Code, the application of section 24(b) of the 1939 Code, and a determination whether certain "management services" fees constituted ordinary and necessary business expenses. The Tax Court decision is reported at 40 T.C. No. 114 where the facts are related in detail. We shall give only a summary.

Petitioner Federal Cement Tile Company was organized as a Delaware corporation in 1946 under the name of Durisol, Inc. From 1946 until 1953, Durisol owned a manufacturing plant at Beacon, New York, and during that period manufactured and sold roofing tiles, utilizing a Swiss invention known as "Durisol Aggregrate." From the start the Durisol company lost money. During the years 1946 through 1953 its losses approximated $1,000,000.

Shifting the scene momentarily, another company, which the Tax Court referred to as "Illinois Federal," was organized as an Illinois corporation in 1943 under the name of The Cement Tile Corporation. Its name was changed in 1944 to Federal Cement Tile Company. The company manufactured and sold roofing tiles in the midwest area; and its plant was located near Hammond, Indiana. Its earnings for its fiscal years 1948 through 1953 exceeded $2,000,000.

The stock of "Illinois Federal" was acquired in November, 1952, by another Illinois corporation, S.E.S., whose stock was held in a voting trust for the benefit of a group known as the "Schulman group" and headed by Samuel E. Schulman. On December 31, 1952, "Illinois Federal" was liquidated into S.E.S., which thereupon changed its name to Federal Cement Tile Company.

It was after this that Schulman learned that Durisol, Inc. was for sale by its owners, John and Louise Dale, who held nearly all of its common stock.

In April, 1953, Schulman on behalf of himself and his group entered into an agreement with the Dales for the purchase, no later than May 13, 1953, of the issued and outstanding stock of Durisol, Inc. and of certain notes issued by Durisol and held or to be acquired by the Dales. The agreement recited that Durisol, Inc. had contemporaneously agreed with the Dales to convey its land and plant to Mrs. Dale in discharge of secured indebtedness owed to Mrs. Dale by Durisol. An additional contemporaneous agreement was executed between the Schulman group and the Dales providing that all of Durisol's inventory, machinery, office furniture, equipment, and certain insurance policies would be conveyed to the Dales for $75,000, and that Durisol would assign to a standby corporation, Durisol, New York, newly formed by the Dales, all its orders and unfilled contracts. It was agreed that the new corporation would fulfill these orders and indemnify the old corporation for claims or damage arising out of such orders and that the old corporation would execute a sublicense to the corporation of the Durisol patent rights. All the agreements were carried out. About May 12, 1953, Durisol, Inc. conveyed its land and building to the Dales in satisfaction of the indebtedness owing to Mrs. Dale. On May 13,

1953, the assets of Durisol, Inc. were transferred to the Dales in exchange for the Durisol stock and notes. Shortly thereafter, Schulman's group caused the merger of Federal Cement Tile Company ("Illinois Federal") into Durisol, Inc., the latter surviving and taking the name of Federal Cement Tile Company. This company, as constituted after the above transactions, is the petitioner in the instant review.

After the merger, petitioner continued to manufacture and sell roofing tiles, using the facilities of the former Illinois corporation and limiting its area of operations to the midwest. Petitioner also commenced efforts to produce roofing tile made by the Durisol process. However, after three years of unsuccessful attempts to manufacture and sell the patented product, petitioner discontinued its efforts and sold its interest in the patent for a nominal sum. During this three-year period petitioner had continued to produce the same type of material manufactured by the Illinois corpration before the merger. The sales of the Durisol product represented only a minor part of its total sales.

## I.

Petitioner claimed deductions totaling approximately $1,400,000 in its 1953–1956 income tax returns for the operating loss carryovers of Durisol, Inc. The Commissioner disallowed the deductions. The Tax Court agreed. The petition for review followed.

In disallowing the loss carryover deductions claimed under sections 23(s) and 122 of the 1939 Code (now section 172 of the 1954 Code), the Tax Court relied upon the decision in Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957). That case held that to claim losses suffered by one enterprise as a deduction in the tax return of a merged enterprise there must be a substantial identity of the two. In the instant case, the Tax Court found, and we agree, that there was no such identity either in ownership or in operation of the businesses. The losses sought to be carried forward were suffered in the years 1950, 1951, and 1952, a period during which the Dales had control of the petitioner. On the other hand, the years 1953 through 1956, for which these losses were claimed as deductions, constituted a period during which petitioner was controlled by the Schulman group. Furthermore, the business conducted from 1953 through 1956 can hardly be said to be substantially the same as that conducted by petitioner from 1950 through 1952. During the earlier period of time, petitioner had operated as Durisol, Inc. an unsuccessful tile roofing business in 15 eastern states. It is true that similar unsuccessful efforts were made to produce and market the Durisol product in the later period. These activities, however, were confined to the midwest and constituted only a minor part of the total sales made by petitioner from 1953 through 1956. Throughout this entire period petitioner continued the same business which had been conducted by the Illinois corporation prior to the merger. It is immaterial that petitioner, the surviving corporation, is nominally the same corporation that sustained the operating losses in the prior years. It is the continuity of the same business rather than the continuity of the same corporate structure which is the test for allowing deductions of losses sustained in prior years. J. G. Dudley Co. v. Commissioner, 298 F.2d 750 (4th Cir. 1962).

To summarize the effect of these corporate dealings, unsuccessful Durisol was stripped of its assets, obligations, customers, and employees. There remained a corporate shell acquired by those in control of the successful Illinois corporation. The latter enterprise, having its own business and operating in a geographic area entirely different from that of Durisol, was then encased in the Durisol corporate shell. Any continuity of the business engaged in by Durisol before and after the transformation was minimal and insignificant. The situation falls squarely within the ambit of Libson Shops.

In an attempt to avoid the impact of Libson Shops, petitioner argues that the Supreme Court did not consider the legislative history preceding the enactment of section 382 of the 1954 Code.[1] It says the Congress, in considering a committee report, entertained the view that operating loss carryovers were allowable under the 1939 Code regardless of a change of corporate ownership unless the transaction was governed by the provisions of section 129 of the 1939 Code. We do not adopt this reasoning. Rather, we assume the Court was aware of this legislative history when it decided Libson Shops, three years after section 382 was enacted.

▮ Petitioner also argues that section 129 of the 1939 Code provides that tax evasion or avoidance must be the principal purpose for the acquisition of control of a corporation if tax advantages are to be denied and that the Schulman group had a legitimate business purpose in acquiring petitioner. A similar argument was made and rejected in Libson Shops. Unless the carryover provisions are otherwise applicable, questions arising under section 129 are not pertinent. Having found a lack of continuity in business enterprise in this case, the Tax Court properly held it unnecessary to decide whether the principal purpose for the acquisition of petitioner was to obtain the claimed deductions.

## II.

In addition to the loss carryover deductions, petitioner also claimed deductions for losses sustained in the sale or exchange of its land, building, fixed assets, and inventories to the Dales.

John and Louise Dale owned more than fifty per cent in value of the outstanding Durisol stock to be transferred to the Schulman group. Petitioner and Mrs. Dale had agreed that before this transfer petitioner would convey its land and building at Beacon, New York, to Mrs. Dale in satisfaction of petitioner's indebtedness to her. It had also been agreed that simultaneously with the transfer of the stock from the Dales to the Schulman group petitioner would transfer to the Dales its inventories and fixed assets. As a result of these transactions petitioner claimed deductible losses for the year 1953 in the approximate amount of $340,000. The Tax Court approved the Commissioner's disallowance of the deductions, ruling that the transactions were governed by section 24(b) of the Internal Revenue Code of 1939 which prohibits deductions for losses resulting from sales of corporate property to individuals who own more than fifty per cent of the corporation's stock.

Petitioner contends that section 24(b) is not applicable because the Dales sold their stock in Durisol before they acquired its property, the agreement by the Dales to sell their stock to the Schulman group being made on April 29, 1953, and the actual transfer of the corporate assets to the Dales occurring on May 12 and 13, 1953. It is argued on behalf of petitioner that Schulman and his associates should be considered the true "owners" of petitioner's stock as of April 29th so that the May 12th and 13th transfers to the Dales were not to parties who were then the owners of more than fifty per cent of petitioner's stock. We concur with the Tax Court's determination that the separate agreements and transactions were parts of a single plan which contemplated that the transfer of corporate stock from the Dales to the Schulman group was not to occur without the accompanying transfer of corporate assets to the Dales.

▮▮ The purchase of the corporate property by the Dales was an integral part of the sale of their stock; one hinged on the other. Regardless of the dates of the agreements and transfers, in reality the Dales while in control of more than fifty per cent of the corporation's stock purchased its assets at an alleged loss to the corporation. The fact that the corporation was not a party to the agreements is unimportant because, viewed realistically, the agreements were between the then controlling stockhold-

---

1. It is conceded by both parties that section 382 itself is not applicable in this case.

ers and the prospective controlling stockholders. Thus viewed, the Dales were in control of the corporation within the meaning of section 24(b) of the Code when its assets were sold and transferred to them. The question of good faith is not controlling. As was stated by the Supreme Court in McWilliams v. Commissioner, 331 U.S. 694, 699, 67 S.Ct. 1477, 1480, 91 L.Ed. 1750 (1947), section 24(b) "states an absolute prohibition—not a presumption—against the allowance of losses on any sales between the members of certain designated groups." The claimed deductions were properly disallowed.

### III.

The third issue before the Tax Court was whether petitioner should be allowed deductions under section 162(a) of the 1954 Code in the amounts of $93,355.61 and $62,341.98 for the taxable years 1956 and 1957 respectively for payments made to its parent, The Mount Vernon Company of Mount Vernon, Ohio, and the parent's controlling stockholder, the Holly Corporation of New York, for management services. The Mount Vernon Company had acquired all of petitioner's outstanding capital stock in October, 1955; and in July, 1957, the Holly Corporation had acquired in excess of fifty per cent of the outstanding stock in The Mount Vernon Company.

In Ingle Coal Corporation v. Commissioner, 174 F.2d 569 (7th Cir. 1949), this court held that an arrangement between a corporation and its controlling stockholders is subject to close scrutiny to determine whether that which is claimed as compensation for services is in reality a distribution of profits. The question is essentially one of fact.

In the instant proceeding, there was no evidence that taxpayer ever requested the services of its parent companies, nor was there any showing that the amounts were reasonable for the services rendered. Compensation services to be deductible as ordinary and necessary business expenses must be appropriate and helpful. Interstate Drop Forge Co.

v. Commissioner, 326 F.2d 743 (7th Cir. 1964). Contrary to petitioner's contention, the mere resolution of the board of directors allowing such payments is not a controlling factor. The test is whether the services were actually necessary. Here, the Tax Court found that petitioner neither showed details of the charges and extent of the services rendered nor furnished any evidence upon which the value of such services could be determined with exactitude. Nevertheless, the Tax Court concluded that some services had been rendered by the corporations which controlled petitioner so as to allow deductions of a partial amount of the payments petitioner made to them. Electing to exercise its discretion, the Tax Court allowed a deduction of $15,000 for services rendered in each of the years 1956 and 1957. The determination of the Tax Court, based on its findings of fact, is entitled to great weight and may not be upset unless clearly erroneous. Commissioner v. Heininger, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171 (1943). We are satisfied that no error was committed in reducing the amounts deductible under section 162.

The decision of the Tax Court is affirmed.