FRANK IX & SONS VIRGINIA CORPORATION (N.J.), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3955-64.    Filed March 11, 1966.

534

*Benjamin Nadel* and *Norman Nadel*, for petitioner.

*Leo A. Burgoyne*, for respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the taxable years ended March 31, 1957, March 29, 1958, and March 28, 1959, in the respective amounts of $84,309.62, $115,954.90, and $22,329.76.

The parties having reached agreement with respect to certain issues, the only issue remaining is whether net operating losses sustained by the petitioner for the taxable years ended March 31, 1953 and 1954, may be carried over and deducted from income earned by it in the taxable years ended March 31, 1957, March 29, 1958, and March 28, 1959, in the light of the principles of *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382.

### FINDINGS OF FACT

Some of the facts have been stipulated and the stipulations are incorporated herein by this reference.

The petitioner is a corporation organized under the laws of New Jersey on or about May 15, 1944, to engage in the manufacture, sale, and distribution of textiles, with its principal office at 3300 Hudson Avenue, Union City, N.J. During the years in issue, it maintained its books and records and filed its Federal income tax returns on an accrual method of accounting and on the basis of a fiscal year consisting of 52 or 53 weeks ending nearest to March 31. It filed its returns with the district director of internal revenue at Newark, N.J.

Petitioner's name when organized was Cornelius Mills, Inc. On or about November 24, 1948, its name was changed to Frank Ix & Sons Carolina Corp., and on or about August 8, 1950, its name was changed to Frank Ix & Sons Sheraton Mills Corp. The change to the present name of petitioner, Frank Ix & Sons Virginia Corp., was made on or about August 2, 1954, after a reorganization described hereinafter.

Another corporation, Frank Ix & Sons of Virginia Inc., was organized under the laws of Virginia on November 18, 1948. On February 14, 1949, its name was changed to Frank Ix & Sons Virginia Corp. (hereinafter referred to as the Virginia Corp.). It was dissolved on October 7, 1954.

When the Virginia Corp. was organized on November 18, 1948, the persons who owned its stock had also owned, in the same propor-

tions, the stock of the petitioner at its organization. The principal officers and directors of petitioner and of the Virginia Corp. were the same until April 29, 1953, namely:

| | |
|---|---|
| President | Alexander F. Ix |
| Vice president | Frank J. Ix, Jr. |
| Vice president | William E. Ix |
| Vice president | Charles W. Ix |
| Treasurer | Alexander F. Ix |
| Secretary | Edward P. Ix |

Alexander F. Ix died on April 29, 1953. On May 14, 1953, Edward P. Ix was elected president and treasurer of each of the corporations to succeed him and Charles W. Ix was elected secretary. Mary Hill Ix, widow of Alexander, was elected a vice president. Thereafter, and during all pertinent times, those individuals continued to occupy these positions.

Petitioner and the Virginia Corp. were, during all times pertinent, engaged in the manufacture and sale of woven synthetic fibers, including nylon, dacron, acetate, and rayon.

Petitioner maintained and operated a factory at Cornelius, N.C. (hereinafter referred to as the Cornelius mill). The Virginia Corp. maintained and operated a factory at Charlottesville, Va. (hereinafter referred to as the Charlottesville mill). The Cornelius mill had spinning and twisting machinery and the Charlottesville mill had throwing machinery. The spinning and twisting machinery and the throwing machinery performed the same functions with respect to the yarn before weaving. Both had similar weaving machinery. The same types and styles of cloth were manufactured in the Cornelius mill as in the Charlottesville mill.

The Ix family group had several corporations, including Frank Ix & Sons, Inc.; Frank Ix & Sons Pennsylvania Corp.; Frank Ix & Sons Carolina Corp.; Frank Ix & Sons New York Corp.; and Frank Ix & Sons Administrative Corp.

Petitioner owned a building located at 3300 Hudson Avenue, Union City, N.J., which at all pertinent times was used by it, the Virginia Corp., and other Ix companies as a central office for accounting, bookkeeping, inventory control, and yarn purchasing. The same staff of employees performed these services for all the corporations. During the years 1949 to 1959 an office was maintained by Frank Ix & Sons New York Corp. at 1441 Broadway, N.Y. Such office maintained a complete technical staff, a production and control staff, and a sales force, which served all the Ix corporations, including the petitioner and the Virginia Corp. The technical staff, consisting of about 10 employees, did the styling and technical layouts; the production planning and control staff scheduled and laid out all the production work for all the plants; and the sales staff, consisting of a sales manager.

2 assistant sales managers, and about 8 salesmen, operated out of the Broadway, New York, office and solicited orders for the manufacture of cloth. Business was solicited throughout the United States. About 70 percent of the business was from customers in the New York City area. The orders so solicited were returned to the New York office where the production and control department determined which of the Ix companies, including petitioner and the Virginia Corp., would manufacture the cloth. Such determination was based in part upon the workload of the various plants as well as the availability of skilled operators in the particular type of fabric to be manufactured. Frank Ix & Sons New York Corp. charged a fee to the various companies for the services it performed as selling agent.

During the time it was in operation, the petitioner's Cornelius mill operated approximately 600 looms and employed 400 to 500 persons. The Virginia Corp.'s Charlottesville mill operated approximately 1,000 looms and employed between 600 and 700 persons. In each mill there were single box looms and multiple box looms. Of the 1,000 looms operated by the Charlottesville mill 352 had been purchased for the petitioner's Cornelius mill over the period 1948 to 1951.

On March 5, 1952, Frank Ix & Sons, Inc., borrowed $3 million at 3½-percent interest from the Guaranty Trust Co. of New York, evidenced by a promissory note with a maturity date of March 1, 1957. That corporation borrowed the money in order to make loans to other Ix family corporations, including the petitioner and the Virginia Corp. As collateral the borrower pledged all the capital stock which it owned in such other corporations,[1] and the promissory notes which it received from them. Among the conditions for the loan was an agreement that during the period the note to the bank remained unpaid the working capital of the various corporations would not be reduced below a specified figure. The amount of working capital required of petitioner under such loan agreement was $2,800,000. It was provided that in the event the working capital of the corporations fell below the specified amount, the borrower would be deemed to be in default.

The amount which the petitioner borrowed from Frank Ix & Sons, Inc., on March 5, 1952, was $2,550,000 at 3½-percent interest which was evidenced by several promissory notes, each with a maturity date of March 1, 1957. Petitioner agreed that during the period the notes remained unpaid, it would maintain working capital in the amount of $2,800,000, and it was provided that failure to maintain such amount of working capital would constitute an act of default. Pur-

---

[1] Frank Ix & Sons, Inc., owned all the preferred stock of both petitioner and the Virginia Corp. It owned 100 of the 606 outstanding shares of class B nonvoting common stock of petitioner, and 140 of the 640 outstanding shares of class B nonvoting common stock of the Virginia Corp.

suant to the loan agreement with Guaranty Trust Co., Frank Ix & Sons, Inc., assigned petitioner's promissory notes to the bank.

By September 30, 1953, the petitioner's working capital had diminished to $1,863,021.29. Thereupon negotiations were carried on with the Guaranty Trust Co. of New York, and a plan of reorganization involving the petitioner and the Virginia Corp. was agreed upon. At that time the common stock of each of those corporations was owned by the same persons (namely the members of the Ix family, Frank Ix & Sons, Inc., and two other companies). Their holdings in the petitioner were in the same proportions (with one small exception) as their holdings in the Virginia Corp. Frank Ix & Sons, Inc., owned all the preferred stock of each corporation. The estimated net worth of the petitioner at September 30, 1953, was $768,438, and of the Virginia Corp. as of the same date was $4,138,674, which included working capital in excess of $1 million. The plan of reorganization provided that the petitioner should increase the amount of its class B common stock and its preferred stock; that the Virginia Corp. would transfer to petitioner all of its properties, assets, and business subject to its debts, liabilities, and obligations; that in consideration of such transfer the petitioner would assume all the debts, liabilities, and obligations of the Virginia Corp. and would issue to it shares of its preferred stock and shares of its class B common stock; that the amount of common stock to be issued should be calculated on the basis that the common stock of the Virginia Corp. had a value of 13 times the value of the common stock of the petitioner; that the Virginia Corp. should distribute the stock so acquired to its stockholders in complete liquidation and dissolution of the Virginia Corp.; and that the petitioner should change its name to Frank Ix & Sons Virginia Corp. The plan of reorganization was fully consummated, including the execution and delivery of a "Bill of Sale and Agreement" dated as of September 30, 1953. After the reorganization the same persons, with minor exceptions, continued to hold the stock of the petitioner at all times material in the same proportion that they had held its stock and the stock of the Virginia Corp. prior to the reorganization. The petitioner and the respondent agree that the reorganization was a nontaxable reorganization under the provisions of the Internal Revenue Code of 1939.

Following the reorganization, the petitioner operated the Cornelius mill and the Charlottesville mill in the same fashion as they had been operated prior to the reorganization. Separate records were kept for each plant. Such records show that the Cornelius mill operated at a net loss of $450,599.51 from October 1, 1953, to March 31, 1954, and at a net loss of $347,083.80 from April 1, 1954, to September 30, 1954. The Ix interests decided that in view of the condition of the textile industry it was advisable to close down one of their mills. Petitioner was having management problems in connection with the Cornelius

mill and it was decided to close down such mill. Accordingly, the manufacturing operations of the Cornelius mill were terminated on or about July 22, 1954. The president of the petitioner did not think the adverse business conditions would continue indefinitely. However, operation of the Cornelius mill was never resumed. All orders then on hand at the Cornelius mill were allocated to the other mills owned by the Ix interest, including the Charlottesville mill.

On March 31, 1954, the Cornelius mill had assets of a book cost of $2,479,000, which included weaving and twisting machinery of a book cost of $1,986,000. On the same date the Charlottesville mill had assets of a book cost of $3,646,000, of which $3,203,000 consisted of weaving and throwing machinery. During the taxable years ended March 31, 1955, to March 28, 1959, there were transferred from the Cornelius mill to the Charlottesville mill various assets having a book cost of approximately $163,000, which included weaving and twisting machinery of a book cost of approximately $157,000.

For the taxable years ended September 30, 1951, to September 30, 1953, the Virginia Corp. realized taxable income as follows:

*T.Y.E. Sept. 30—*                                       *Taxable income*

| T.Y.E. Sept. 30— | Taxable income |
|---|---|
| 1951 | $498, 753. 75 |
| 1952 | 377, 295. 44 |
| 1953 | 1, 507, 861. 04 |

For the taxable years ended March 31, 1947, through March 31, 1953, during which time the petitioner was operating only the Cornelius mill, it realized taxable income and sustained net operating losses as follows:

| Taxable year ended Mar. 31— | Taxable income | Net operating loss |
|---|---|---|
| 1947 | $947, 778. 40 | |
| 1948 | 1, 559, 150. 92 | |
| 1949 | 320, 788. 50 | |
| 1950 | 2, 689. 46 | |
| 1951 | [1] 80, 796. 96 | |
| 1952 | | [2] $566, 437. 53 |
| 1953 | | 904, 596. 84 |

[1] Before deduction resulting from carryback of net operating loss for the fiscal year ended Mar. 31, 1952.
[2] Remainder after deducting the portion carried back to prior years.

For the taxable year ended March 31, 1954, during which the petitioner operated the Cornelius mill and during a part of which it also operated the Charlottesville mill, the petitioner sustained a net loss of $211,012.93.[2]

For its taxable years ended March 31, 1955, through March 28, 1959 (without regard to any deductions on account of any net operating

[2] As found hereinabove, the Cornelius mill operated at a net loss of $450,599.51 from Oct. 1, 1953, to Mar. 31, 1954. Also, in connection with the reorganization, the parties thereto estimated that the Cornelius mill operated at a loss of $50,000 for the period Apr. 1, 1953, to Sept. 30, 1953.

losses of prior years), the petitioner realized taxable income, as follows:

| Taxable year ended | Taxable income |
|---|---|
| Mar. 31, 1955 | [1] $340,004.15 |
| Mar. 31, 1956 | 385,628.29 |
| Mar. 31, 1957 | 162,781.75 |
| Mar. 29, 1958 | 579,541.09 |
| Mar. 28, 1959 | 354,721.30 |

[1] From Apr. 1, 1954, until July 22, 1954, the petitioner operated both the Cornelius mill and the Charlottesville mill, and thereafter operated only the latter. As found hereinabove the Cornelius mill operated at a net loss of $347,083.80 from Apr. 1, 1954, until it ceased operating on July 22, 1954.

The reported amount of petitioner's net operating loss for the taxable year ended March 31, 1952 (after subtracting the portion carried back to prior years), and a portion of its reported net operating loss for the taxable year ended March 31, 1953, were carried over by it and claimed as deductions for its taxable years ended March 31, 1955 and 1956, to the extent of taxable income reported for those years. Respondent did not make any determination of deficiencies for those years. The remaining portion of petitioner's reported net operating loss for the taxable year ended March 31, 1953, and the entire amount of its reported net operating loss for the taxable year ended March 31, 1954, were carried over by it and claimed as deductions from its income of its taxable years ended March 31, 1957, March 29, 1958, and March 28, 1959. In the notice of deficiencies for the latter 3 years the respondent determined that "you are not entitled to net operating loss deductions in the taxable years ended March 31, 1957, to March 28, 1959, inclusive, based upon losses sustained in the taxable years ended March 31, 1953, to March 31, 1954."

OPINION

The question presented is whether the petitioner, in computing its taxable income for the taxable years ended March 31, 1957, March 29, 1958, and March 28, 1959, may deduct, pursuant to sections 23(s) and 122 of the Internal Revenue Code of 1939, and section 172 of the Internal Revenue Code of 1954,[3] net losses sustained by it in its taxable

[3] Sec. 23(s) of the 1939 Code provides for the deduction of the net operating loss deduction computed under sec. 122. Sec. 122(b)(2)(B) of the 1939 Code provides in part:

Loss for Taxable Year Beginning After 1949.—If for any taxable year beginning after December 31, 1949, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the five succeeding taxable years, * * *

Sec. 172 of the Internal Revenue Code of 1954 provides in part:

(a) DEDUCTION ALLOWED.—There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. * * *

 *       *       *       *       *       *       *

(g) SPECIAL TRANSITIONAL RULES.—

(1) LOSSES FOR TAXABLE YEARS ENDING BEFORE JANUARY 1, 1954.—For purposes of this section, the determination of the taxable years ending after December 31, 1953, to which

Footnote continued at bottom of following page.

years ended March 31, 1953, and March 31, 1954.[4]

It is the respondent's position that the business in which the net operating losses were sustained was not substantially the same business which gave rise to the income sought to be offset by the carryovers, and that, under the principle of *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382, the net operating losses are not deductible. The petitioner, on the other hand, contends that under the circumstances here presented it should be considered that the same business gave rise to the losses and to the income sought to be offset, and that the principle of the *Libson Shops* case is not applicable.

In *Libson Shops, Inc.* v. *Koehler, supra*, the same interests owned 17 corporations, 16 of which were engaged in the retail clothing business and 1 of which was engaged in rendering management services to the others. Each of these 17 corporations filed separate income tax returns. The 16 sales corporations were merged into the managing corporation (the same interests continuing in control), and the surviving corporation conducted the entire business as a single enterprise. Prior to the merger three of the sales corporations had net operating losses, and the year following the merger each of the retail units formerly operated by these three corporations continued to sustain operating losses. In its income tax return for the first year after the merger the surviving corporation claimed deductions for the net operating losses of these three constituent corporations. The Supreme Court held that the claimed deductions were not allowable, stating in part:

> The requirement of a continuity of business enterprise as applied to this case is in accord with the legislative history of the carry-over and carry-back provisions. Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year. There is, however, no indication in their legislative history that these provisions were designed to permit the averaging of the pre-merger losses of one business with the post-merger income of some other business which had been operated and taxed separately before the merger. What history there is suggests

---

a net operating loss for any taxable year ending before January 1, 1954, may be carried shall be made under the Internal Revenue Code of 1939.

It should be pointed out that sec. 381 of the 1954 Code contains special provisions for carryovers in certain corporate acquisitions, and that sec. 382 contains special limitations on net operating loss carryovers. However, it is clear that the transaction here involved occurred before the effective date of those sections. See secs. 393 and 394 of the 1954 Code ; *Irving-Kolmar Corporation*, 35 T.C. 712 ; *Allied Central Stores, Inc.* v. *Commissioner*, (C.A. 2) 329 F. 2d 503, certiorari denied 381 U.S. 903, affirming a Memorandum Opinion of this Court ; and *Federal Cement Tile Co.*, 40 T.C. 1028, affd. (C.A. 7) 338 F. 2d 691. It may be added that apparently the petitioner does not contend that secs. 381 and 382 are applicable.

[4] On brief the petitioner refers to the carryover to such years of its net operating loss for its taxable year ended Mar. 31, 1952. However, it seems apparent that its net loss for that year has been exhausted by having been carried over and deducted from income of the taxable years ended Mar. 31, 1955, and Mar. 31, 1956.

that Congress primarily was concerned with the fluctuating income of a single business.[6]

\*　　\*　　\*　　\*　　\*　　\*　　\*

Petitioner is attempting to carry over the pre-merger losses of three business units which continued to have losses after the merger. Had there been no merger, these businesses would have had no opportunity to carry over their losses. \* \* \*

\* \* \* The fact that § 129(a) is inapplicable does not mean that petitioner is automatically entitled to a carry-over. The availability of this privilege depends on the proper interpretation to be given to the carry-over provisions. We find nothing in those provisions which suggest that they should be construed to give a "windfall" to a taxpayer who happens to have merged with other corporations. The purpose of these provisions is not to give a merged taxpayer a tax advantage over others who have not merged. We conclude that petitioner is not entitled to a carry-over since the income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses.[9] [Footnotes omitted.]

In the instant case both the petitioner and the Virginia Corp. were owned by the same interests, principally the Ix family. During its fiscal years ended March 31, 1951, 1952, and 1953, the petitioner had suffered large operating losses from the operation of the Cornelius mill. The Virginia Corp. for its taxable years ended September 30, 1951, 1952, and 1953, had operated the Charlottesville mill at substantial profits. As of September 30, 1953, pursuant to a tax-free reorganization, the petitioner acquired the assets of the Virginia Corp. and continued, for a time, to operate both mills. Each was operated as a separate division and separate records of the operations were kept. The Cornelius mill continued to operate at a loss, while the Charlottesville mill operated at a profit. On July 22, 1954, the petitioner terminated its operation of the Cornelius mill, but continued to operate the Charlottesville mill at a profit throughout the following years, including the taxable years in question, namely, the taxable years ended March 31, 1957, March 29, 1958, and March 28, 1959. During the time that the two mills were in operation, both before and after the reorganization, each manufactured the same types of products, woven synthetic fibers; each used similar equipment; and another Ix family controlled corporation, Frank Ix & Sons New York Corp., provided the staff which rendered services to each of them, including production planning, styling and technical layouts, sales solicitations, yarn purchasing, and bookkeeping, accounting, and inventory control. Orders from customers were allocated by Frank Ix & Sons New York Corp. among the Cornelius mill, the Charlottesville mill, and other mills operated by the Ix interests.

The petitioner contends that the operation, prior to the reorganization, of the Cornelius mill by the petitioner and the operation by the Virginia Corp. of the Charlottesville mill constituted substantially the

same business (even though operated by different corporations), and that the petitioner operated the same business in its taxable years ended March 31, 1957, March 29, 1958, and March 28, 1959, even though in those years it was operating only the prosperous Charlottesville mill. It is its contention that the shutdown of the Cornelius mill on July 22, 1954, was not the termination of a business, but was merely the termination of one of the business' manufacturing plants, and that the same business continued on thereafter, using only the Charlottesville mill to fill orders.

We cannot agree with the petitioner that there was here the requisite continuity of business enterprise. Even though, prior to the reorganization, the operation of the two mills constituted similar businesses and each business utilized the same management facilities, the fact remains that each mill constituted a separate business operated by a different corporation, and each business was taxed separately. The net operating losses sought to be carried over were sustained entirely in the petitioner's operation of the Cornelius mill. The income against which the deduction is sought to be taken was derived entirely from the operation of the Charlottesville mill. Such deduction is precluded under the principle of the *Libson Shops* case. To paraphrase the language of the Supreme Court in that case, petitioner is attempting to carry over the prereorganization losses of a business unit which continued to have losses after the reorganization; had there been no reorganization, and the acquisition by the petitioner of the prosperous Charlottesville mill in connection therewith, there would have been no opportunity to carry over the losses of the Cornelius mill. And it is now well established that the fact that the continuing corporation is the same corporation which sustained the operating losses in the prior years, does not serve to render inapplicable the rule of the *Libson Shops* case. *J. G. Dudley Co.*, 36 T.C. 1122, affd. (C.A. 4) 298 F. 2d 750; *Huyler's*, 38 T.C. 773, affd. (C.A. 7) 327 F. 2d 767; *Julius Garfinckel & Co.*, 40 T.C. 870, affd. (C.A. 2) 335 F. 2d 744; and *Federal Cement Tile Co.*, 40 T.C. 1028, affd. (C.A. 7) 338 F. 2d 691.

The *Garfinckel* case is closely in point. There Garfinckel & Co. had acquired in 1946 and 1947 all the stock of Brooks Bros., a New York corporation long engaged in the manufacture and retail sale of men's wear. By 1952 Garfinckel & Co. had acquired 58 percent of the stock of A. DePinna, a New York corporation engaged in the manufacture and retail sale of both men's and women's clothing. In February 1952, it caused Brooks Bros. to merge into DePinna, the latter corporation surviving, with Garfinckel & Co. owning 95 percent of its stock. For several years preceding the merger DePinna had sustained substantial net operating losses, while Brooks Bros. had made substantial profits. After the merger the two businesses were operated

as separate divisions. The DePinna division continued to suffer losses and the Brooks Bros. division continued to operate at a profit. In its returns filed for its taxable years ended July 31, 1952, 1953, and 1954, the surviving corporation claimed as a deduction its premerger net operating losses. We there held, and the Court of Appeals agreed, that the principle of the *Libson Shops* case prevented the allowance of the claimed net operating losses, it being immaterial that it was the loss corporation which survived the merger. There the Court of Appeals stated "We find no reason to think the Supreme Court would have decided *Libson Shops* differently if the 14 profit-making corporations had been merged into the 3 losing corporations and these had survived."

Petitioner makes much of the fact that at all times material the same interests owned the petitioner and the Virginia Corp. in the same proportions. We cannot attach any significance to that fact since in the *Libson Shops* case the same interests which controlled all the corporations before the merger continued to control the surviving corporation.

The petitioner further argues that it is entitled to the beneficial treatment accorded by Rev. Rul. 63-40, 1963-1, C. B. 46, wherein the respondent announced that he would not rely upon the *Libson Shops* doctrine to bar a corporation from carrying over losses from a discontinued business against income from a new business enterprise acquired through a cash purchase of assets of an unrelated corporation, there being no change in the stock ownership of the corporation. We see no basis for applying that ruling in the instant situation. The instant case does not involve the cash purchase of assets of an unrelated corporation.

We have given careful consideration to the contention made by the petitioner that to allow the carryover and deduction of the net loss of $211,012.93 for the taxable year ended March 31, 1954, would not violate the principle of the *Libson Shops* case. It is its contention that such net loss was realized after the reorganization and that there is no reason for disallowing such a post-reorganization loss from profits of its subsequent years. It argues that since in the last 6 months of the taxable year ended March 31, 1954, the Cornelius mill operation resulted in a net loss of $450,599.51 and that since this is far in excess of the $211,012.93 net operating loss for the entire taxable year ended March 31, 1954, such net operating loss of $211,012.93 must have been sustained after September 30, 1953. We cannot agree with this reasoning. The Cornelius mill may have had substantial losses during the first half of that taxable year. Indeed, the parties to the reorganization estimated that the Cornelius mill operated at a loss of $50,000 for the period April 1, 1953, to September 30, 1953. Ac-

cordingly, we are forced to conclude that at least some portion (which we cannot determine) of the net loss would be attributable to that portion of the taxable year prior to the reorganization. Thus, to allow the net operating loss for the taxable year ended May 30, 1953, to be carried over and deducted from income of the taxable years ended March 31, 1957, March 29, 1958, and March 28, 1959, would, at least to some extent, result in applying the prereorganization loss from one business against the post-reorganization income of a different business, contrary to the principle of the *Libson Shops* case. Even if we were able upon this record to calculate the portion of petitioner's net operating loss sustained in the last half of its taxable year ended March 31, 1954, it is our opinion that the annual accounting principle upon which our tax system is based (*Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359) would preclude us from fragmentizing such taxable year and treating such portion as a net operating loss which may be carried over to another year and deducted. Section 122 of the Internal Revenue Code of 1939 refers to the net operating loss "for any taxable year," and section 48(a) of that Code defines "taxable year" as "the calendar year, or the fiscal year ending during such calendar year, upon the basis of which the net income is computed."

We hold that the respondent did not err in disallowing the claimed net operating loss deductions.

*Decision will be entered under Rule 50.*