**FRANK IX & SONS VIRGINIA CORPORATION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 16131.**

United States Court of Appeals
Third Circuit.

Argued Jan. 6, 1967.

Decided April 12, 1967.

Rehearing Denied May 1, 1967.

---

Benjamin Nadel, Norman Nadel, New York City, for petitioner.

Gilbert E. Andrews, Atty., Dept. of Justice, Tax Division, Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Anthony Zell Roisman, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before McLAUGHLIN, SMITH, and FREEDMAN, Circuit Judges.

## OPINION OF THE COURT

FREEDMAN, Circuit Judge:

Petitioner attacks the Tax Court's disallowance of net operating loss carryover deductions on losses which it incurred prior to a reorganization.

The Ix family, through a number of corporations, was engaged in the manufacture and sale of woven synthetic fibers. Separate corporations operated separate mills which manufactured the same types and styles of cloth within the multicorporation structure. A central office was maintained for accounting, bookkeeping, inventory control and yarn purchasing. There was also provided a central sales force as well as complete technical and production and control staffs. Orders were solicited and returned to a central office in New York where the production and control department determined on the basis of work load and availability of skilled operators which corporation would manufacture the cloth.

In 1952 Frank Ix & Sons, Inc., borrowed $3,000,000 from a bank to make loans to a number of Ix family corporations. To secure the bank indebtedness it pledged as collateral all the capital stock which it owned in the other Ix family corporations and the promissory notes which it received from them for their participation in the loan. One of the conditions of the bank's loan was the maintenance in specified amounts of the working capital of the family corporations.

One of the Ix family corporations operated a mill in Cornelius, North Carolina. Because of the similarity in names of the various Ix corporations and the change in the corporate name of the petitioner, we shall refer to this entity as "Cornelius Ix." Cornelius Ix received $2,550,000 from Frank Ix & Sons, Inc., the major share of the bank loan. In accordance with the bank's requirement, Cornelius Ix agreed that it would maintain its working capital in the amount of $2,800,000. More than a year and a half later, when Cornelius Ix's working capital had fallen nearly a million dollars

below the stipulated requirement, a plan of reorganization was adopted with the bank's approval by which there were transferred to Cornelius Ix all of the assets of another Ix family corporation which operated a mill in Charlottesville, Virginia, and which we shall for convenience refer to as "Charlottesville Ix." Both corporations were engaged in the manufacture and sale of woven synthetic fibers, and their common stock was owned in the same proportions by Ix family members. Pursuant to the plan of reorganization Charlottesville Ix transferred all its assets to Cornelius Ix, in return for which Charlottesville Ix received new common stock of Cornelius Ix on the basis of thirteen shares of Cornelius Ix for each outstanding share of Charlottesville Ix. Charlottesville Ix then distributed these shares to its stockholders in complete liquidation and was dissolved. The plan of reorganization was fully consummated on September 30, 1953, and Cornelius Ix changed its name to Frank Ix & Sons Virginia Corporation, the petitioner. It is conceded that the transaction constituted a valid tax-free "D reorganization" under § 112(g) (1) (D) of the Internal Revenue Code of 1939. After the reorganization the same persons held the common stock in the new corporation in the same proportions as their pre-reorganization holdings in Cornelius Ix and Charlottesville Ix.

Cornelius Ix had operated its mill at a loss before the reorganization for the years ending March 31, 1952 and March 31, 1953. After the reorganization, petitioner operated both the mill in Cornelius, North Carolina and the mill in Charlottesville, Virginia, maintaining separate records for each of them, until July 22, 1954, when it shut down the North Carolina mill, which had continued to operate at a loss. The Charlottesville, Virginia mill had realized taxable net income in the years prior to the reorganization and continued to operate at a profit thereafter. For the year ending March 31, 1954, the first fiscal year after the reorganization, petitioner showed a net loss from the operation of the

Cornelius mill for the period from September 30, 1953 to the end of the fiscal year, and sustained a net operating loss for the full fiscal year.

What is before us now is the determination by the Commissioner of deficiencies resulting from petitioner's deduction on its 1957, 1958 and 1959 income tax returns of net operating losses sustained by Cornelius Ix for the fiscal year ending March 31, 1953,[1] and by Cornelius Ix and petitioner for the fiscal year ending March 31, 1954. The action of the Commissioner was upheld by the Tax Court on the ground that the deductibility of the net operating loss carryovers was determined by the 1939 Code, under which the deduction was barred by the doctrine of Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957). Frank Ix & Sons Virginia Corporation (N.J.) v. C. I. R., 45 T.C. 533 (1966).

In the Tax Court petitioner's argument for the deductions rested on two grounds. One was that the *Libson Shops* doctrine was inapplicable to the transaction because Cornelius Ix, which acquired the assets of Charlottesville Ix, was a loss corporation, which made the situation radically different from that with which the *Libson Shops* doctrine dealt. The second contention was that in any event the "continuity of business enterprise" requirement of the *Libson Shops* doctrine had been met.

These two contentions lead us back to the Libson Shops case, which the Supreme Court decided in 1957 under the 1939 Code. There a number of individuals directly or indirectly owned in the same proportions the stock of seventeen corporations. One of the corporations provided management services for the remaining sixteen corporations, each one of which, separately operated, was engaged in the retail sale of women's apparel. Each corporation filed a separate income tax return. In a tax-free reorganization the sixteen operating corporations, three of which had been sustaining losses and thirteen of which had been profitable, were merged into the management corporation. The Commissioner disallowed the deduction by the surviving corporation from its net income derived from the thirteen profitable units of the losses carried over from former years of the three unprofitable corporations. The Supreme Court found it unnecessary to decide the Commissioner's primary contention that the surviving corporation was not the same "taxpayer" as that which had sustained the losses in the prior years.[2] Instead the Court disallowed the deduction on the ground that the losses, and the profits from which they were sought to be deducted, were not produced by "substantially the same businesses." The Court thus chose to decide the case on the basis of economic substance rather than on the more technical question whether the surviving corporation was the same "taxpayer" as the constituent units which had sustained the losses.

The Libson Shops case has given rise to a flood of discussion and much dispute regarding its application in particular circumstances.[3] The facts in the present case however, fall so remarkably close to the circumstances which existed in *Libson Shops* and we therefore stand

1. The net operating loss for the fiscal year ending March 31, 1953 was carried over only in part to the years here involved. Petitioner utilized a portion of it in earlier returns which the Commissioner did not challenge.

2. Sections 23(s) and 122(b) (2) (C) of the 1939 Code authorized a net operating loss carryover for three years "if for any taxable year beginning after December 31, 1947, and before January 1, 1950, *the taxpayer* has a net operating loss. * * *" (Emphasis added.)

3. See, e. g., Comment, Loss Carryover—The Viability of the Libson Shops Doctrine under the 1954 Code, 61 Northwest.L.Rev. 555 (1966); Tarleau & Hodes, Libson Shops and the 1954 Code, 20 Southwest. L.J. 258 (1966); Harris, Libson Shops and Related Cases, N.Y.U. 21st Inst. on Fed.Tax 1307 (1963); Comment, Loss Carryovers and the Libson Shops Doctrine, 32 U.Chicago L.Rev. 508 (1965).

so close to the center of the doctrine that there is no need to consider its application in the more remote areas in which its repercussions may be felt. The decisive fact in *Libson Shops* was that a number of individuals had chosen to cast their investment into seventeen separate corporations and thus to spread the risk of their undertaking among separate business units and to enjoy the benefits of separate incorporation and separate tax returns for each of them. Thus, by their own choice they made each corporation a separate business unit as well as a separate taxpayer. The Court therefore determined that they could not disregard this choice in order to enjoy the deduction of a net operating loss carryover of one taxpayer-business unit from the profits of another, separate taxpayer-business unit by a formal act of corporate merger. The court believed that such a deduction was forbidden by the policy underlying the allowance of net operating loss carryovers, which was to protect a single business from the hazards of fluctuating income. The establishment of the seventeen separate business units was a choice in the opposite direction; within each individual unit the loss carryover provision applied, but the investors could not enjoy that benefit and also reap the contradictory advantage, by merger, of enjoying the loss carryover advantage beyond the boundaries of the individual unit.

In the present case, as in *Libson Shops,* individuals chose to cast their investment into separate corporate units, each of which was a separate economic entity as well as a separate legal entity, and the assets which produced the income against which earlier losses were sought to be applied were different from the assets which produced the losses. If the separate businesses had not been combined there would have been no right to utilize the net operating loss carryover from the unprofitable corporation to reduce the taxable income of the profitable corporation. Whatever differences exist between the factual circumstances in the present case and in *Libson*

*Shops* are not of decisive significance. The fact that what occurred here was not an "A reorganization", a statutory merger, but instead a "D reorganization", a transfer of assets for stock, is a factual difference without any legal distinction. The policy of *Libson Shops,* where indeed there was a retention of one hundred per cent control, cannot be diminished because the "D reorganization" involved here was subject to a statutory requirement of eighty per cent retention of control of the transferee corporation by the owners of the transferor corporation.

Petitioner earnestly contends that the fact that here the loss corporation acquired in reorganization the assets of the profitable corporation significantly distinguishes this case from *Libson Shops,* where the central service corporation absorbed by merger the remaining sixteen corporations including the three loss corporations.

Shortly after the Supreme Court decided *Libson Shops* the view was advanced that the decision might have been different had the loss corporations survived. For there would then not be present the implication that the transaction was without a business purpose, which is so clearly evident when a loss corporation is acquired by a profitable corporation, a transaction which ordinarily has no economic advantage except for the net operating loss carryover which the absorbing corporation, as a result of taking over the shell, can apply against its net taxable income. On the other hand, if the loss corporation is the survivor in the reorganization, it is to be looked upon as the business enterprise which continues, and this prevents regarding it as an empty shell acquired by another merely for the purpose of enjoying its accumulated net losses. In addition, where the loss corporation is the survivor, the identity of the corporation which had sustained the original losses and the corporation which is carrying them forward to the tax year for deduction is the same, and this satisfies the requirement, which *Libson Shops* had

emphasized, that the deduction must be taken by the same taxpayer which had suffered the original loss.[4]

 These distinctions, however, are too artificial for application in dealing with economic realities. It is easy enough for those planning a reorganization to turn the shell on end and make it the surviving corporation if this difference will have substantial tax advantages. The courts to which the question has been presented therefore have rejected the distinction. Allied Central Stores, Inc. v. C. I. R., 339 F.2d 503 (2 Cir. 1964), cert. denied, 381 U.S. 903, 85 S. Ct. 1447, 14 L.Ed.2d 285 (1965); see Julius Garfinckel & Co., Inc. v. C. I. R., 335 F.2d 744 (2 Cir. 1964), cert. denied, 379 U.S. 962, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965).[5] We agree with this view, especially where, as in this case, the corporations involved were originally owned by the same individuals, whose proportionate interest in each corporation was the same. The conclusion is compelled by the underlying policy of Libson Shops that losses incurred by a business unit should not be applied against profits which come from other assets which the shareholders had originally decided to operate separately, even though each unit is owned by the same group of shareholders. Nor is the fact that the reorganization in the present case resulted from the requirements which the bank imposed for business reasons a factor which should alter the conclusion. The Supreme Court pointed out in Libson Shops that its denial of the carryover was not based upon a finding that the shareholders had a tax avoidance purpose in bringing about the reorganization,[6] but resulted from the underlying purpose of the carryover provision itself.

353 U.S. at 388–390, 77 S.Ct. 990, 1 L. Ed.2d 924. A reorganization which seeks to extinguish the original plan by which there were established separate business units conducted by separate corporate entities cannot make possible the crossing of the lines of corporate identity by a loss carryover, for the carryover provision was designed only to aid the single business which had gone through a period of fluctuating income, and not to give an added advantage to the common owners of separate corporations.

 Petitioner invokes Revenue Ruling 63–40,[7] which permits the carryover of a net operating loss where a corporation which is sustaining losses in its business acquires from unrelated sellers the assets of another business which it then carries on. This change in activity by the same corporation presents a situation which the Supreme Court in Libson Shops expressly noted was not reached by its opinion.[8] The Revenue Ruling is inapplicable where a group of shareholders choose originally the benefits of separate incorporation. It merely recognizes the general principle acknowledged by the Second Circuit in Norden-Ketay Corp. v. C. I. R., 319 F.2d 902, 906 (2 Cir. 1963): "It may well be that shareholders who sustain a loss and then are wise enough to liquidate an uneconomic enterprise and embark on a different and profitable field of endeavor through the same corporation are equally entitled to offset the earlier losses as those who see an unprofitable corporation through the lean years into the good ones in the same activity."

In its argument before us, petitioner has raised for the first time the contention that although the amount of the losses for the fiscal years ending March 31,

4. See Levine & Petta, Libson Shops: A Study in Semantics, 36 Taxes 445, 449 (1958).

5. See also Fawick Corp. v. C.I.R., 342 F.2d 823, 826 (6 Cir. 1965); Federal Cement Tile Co. v. C.I.R., 338 F.2d 691 (7 Cir. 1964); Huyler's v. C.I.R., 327 F.2d 767 (7 Cir. 1964); Foremost Dairies, Inc. v. Tomlinson, 238 F.Supp. 258 (M.D.Fla. 1963), aff'd, 341 F.2d 580 (5 Cir. 1965).

6. See § 129(a) of the 1939 Code, now § 269 of the 1954 Code.

7. 1963–1 Cum.Bull. 46.

8. See 353 U.S. at 390, n. 9, 77 S.Ct. 990; C.I.R. v. Virginia Metal Products, Inc., 290 F.2d 675, 677 (3 Cir. 1961), cert. denied, 368 U.S. 889, 82 S.Ct. 140, 7 L.Ed.2d 88 (1961); Julius Garfinckel & Co., Inc. v. C.I.R., supra.

1953 and 1954 are to be calculated under the 1939 Code, the right to deduct them as loss carryovers in the fiscal years 1957, 1958 and 1959 is determined by the Internal Revenue Code of 1954.

Section 172(a) of the 1954 Code is a general provision authorizing the deduction of net operating losses which are carried over from former years; it is similar to the provision of § 23(s) of the 1939 Code. The 1954 Code, however, contains new provisions in § 381 and § 382 which deal with carryovers in certain corporate acquisitions and special limitations on net operating loss carryovers. Section 381, to the extent it is relevant here, provides that a corporation which acquires the assets of another corporation in certain tax-free transactions, such as a "D reorganization," shall succeed to the net operating loss carryover of the acquired corporation. § 381 (a) (2), (c) (1). Section 382 establishes two limitations on the carryover of a net operating loss: (1) it completely disallows any loss carryover where there has been a change of fifty percentage points or more in the ownership of the total fair market value of the outstanding stock of the corporation among any one or more of the ten persons who own the greatest percentage of the stock, and where the corporation has not continued to carry on substantially the same trade or business as that conducted before the change in ownership, (§ 382(a)); and (2) it imposes a proportionate reduction in the amount of the net operating loss carryover permitted where in a reorganization such as a "D reorganization" the shareholders of the loss corporation immediately after the reorganization own less than twenty per cent of the fair market value of the outstanding stock of the acquiring corporation (§ 382(b)), a proportionate limitation which does not apply, however, if the transferor corporation and the acquiring corporation are owned substantially by the same persons in the same proportions. (§ 382 (b) (3)).[9]

■ Petitioner argues that the maze of provisions in § 381 and § 382 which provide for the survival of a loss carryover in the hands of a transferee corporation and place limitations upon it, are inapplicable under their terms where it is the loss corporation which survives. From this it claims that it enjoys the right to the deduction of the net operating loss carryover under the simple authority of § 172(a), which, with §§ 381 and 382 inapplicable, is accordingly without limitation.[10] The result of their contention would be that a loss corporation absorbing by reorganization a profitable corporation would enjoy without any limitation the right under § 172(a) to deduct net operating loss carryovers. Although the language of § 382 does not indubitably lead to petitioner's construction of its meaning,[11] we are not required to decide the question. For by the express terms of the Code,[12] neither § 381 nor § 382 is applicable to the present case because they are effective only where the plan of reorganization is adopted on or after June 22, 1954. Petitioner argues, however, that since under its view §§ 381 and 382 would by their terms be inapplicable where the loss corporation survives and thus § 172(a) would be operative without limitation, it is true a fortiori where §§ 381 and 382 are inapplicable because of their effective dates. In effect, this argument if accepted would mean that petitioner would obtain the benefit of whatever plan the 1954 Code envisages even though essential

9. The provisions of §§ 381 and 382 are discussed at length in Net Operating Loss Carryovers and Corporate Adjustments: Retaining an Advantageous Tax History under Libson Shops and Sections 269, 381 and 382, 69 Yale L.J. 1201, 1238–67 (1960).

10. Section 269, which deals with attempts to avoid tax, concededly is not here involved.

11. Thus, § 382(b) (1) applies "If * * * the transferor corporation or the acquiring corporation" has the net operating loss.

12. Sections 393(b) (1) and 394.

portions of the plan had not yet come into effect.

The law which existed on September 30, 1953 when the plan of reorganization was consummated was the 1939 Code. Its § 23(s) was substantially reincorporated in the 1954 Code as § 172 (a). In these circumstances we see no reason why the taxpayer should be freed from the judicially created *Libson Shops* doctrine before the restrictions of § 381 and § 382 went into effect even if they should be considered to be congressional substitutes for the *Libson Shops* doctrine. If they were such substitutes, the fact that Congress held them in abeyance until June 22, 1954 in order to permit taxpayers to complete pending transactions in reliance on the former law,[13] can result in no less than the continued validity of the *Libson Shops* doctrine until they went into effect. In saying this we do not mean to indicate what our view would be in the case of a plan of reorganization adopted after June 22, 1954 which would bring into the problem the extent to which §§ 381 and 382 are substitutes for the *Libson Shops* doctrine and their applicability where an acquisition is made by a loss corporation by way of merger or other reorganization.

Finally, petitioner claims that in any event it should be permitted to deduct the full amount of the net operating loss of $211,012.93 for the fiscal year ending March 31, 1954, because it is less than the loss which the Cornelius mill sustained in the six months period after the reorganization. It recognizes that in the view we have taken of the case it can only set off losses of the Cornelius mill against profits of the Charlottesville mill in the six months post-reorganization period. The figures are not separated for the post-reorganization period and, as the Tax Court pointed out, some of petitioner's net loss of $211,012.93 may have been derived from losses incurred by the Cornelius mill in the pre-reorganization period. It is therefore impossible to determine on the record the post-reorganization net loss of petitioner, and since petitioner had the means to establish it but failed to do so, it cannot now complain.

The decision of the Tax Court will be affirmed.

13. Senate Committee Report accompanying H.R. 8300, 1954–3 U.S.Code Cong. & Admin.News, p. 4925.