**HUYLER'S, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 14224.**

United States Court of Appeals
Seventh Circuit.

Feb. 6, 1964.

Rehearing Denied March 5, 1964.

Robert S. Ashby, Indianapolis, Ind., Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., of counsel, for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Tax Division, Gilbert E. Andrews, Jr., Lee A. Jackson, I. Henry Kutz, Attorneys, Department of Justice, Washington, D. C., for respondent.

Before HASTINGS, Chief Judge, and KNOCH and KILEY, Circuit Judges.

KNOCH, Circuit Judge.

Petitioner, Huyler's, was organized in New York in 1881 with broad powers. According to the Restated Certificate of Incorporation filed November 1, 1950, the purposes for which the corporation was formed included the following:

"(d) To buy, hold, own, manufacture, produce, sell, exchange, import, export, and otherwise hold and dispose of, either as principal or agent, and upon commission or otherwise, all kinds of personal property whatsoever, except bills of exchange, without limit as to amount and without restriction as to location;

"(e) To apply for, purchase, or otherwise acquire, hold, own, use, operate, sell, assign and grant, or conduct licenses, in respect to, any or all inventions, improvements and processes issued in connection with or secured under Letters Patent of the United States or elsewhere."

Initially, Huyler's engaged in operating restaurants and making candy. In April, 1951, a petition for an arrangement under Chapter XI of the Bankruptcy Act was filed in New York, as a result of which a receiver was appointed who operated Huyler's affairs and issued Receiver's Certificates which constituted a first lien on all Huyler's assets. The Chapter XI proceeding was dismissed in February 1952. At that time Huyler's was no longer making candy and was operating only eleven restaurants. In April of the same year another petition was filed, this time for reorganization of Huyler's under Chapter X of the Bankruptcy Act.

The amended plan of reorganization which was approved in that proceeding provided for the same corporation to continue although the Certificate of Incorporation was amended to eliminate existing preferred and common stock and the interests of all the original shareholders, and to provide for 100,000 shares of $1 par value capital stock. Distribution was as follows: 52,000 to holders of the aforesaid Receiver's Certificates with first priority and to creditors who received about one share for each $36 in claims; 48,000 to three new investors who invested $250,000 in Huyler's. (In May and August 1954, these 48,000 shares were sold for an aggregate price of $315,000.) These three new investors also received $250,000 of 5% Debentures. (These debentures were surrendered to Huyler's in advance of redemption at par on August 31, 1954.) $362,041.24 of Subordinated 6% Debentures were issued to the United States in payment of outstanding tax liability and to other taxing authorities and creditors. For each year in which Huyler's was not obliged to pay an income tax, 52% of the net income was to go into a sinking fund for these subordinate debentures.

Huyler's interest in four restaurants was assigned to the designate of owners of the Receiver's Certificates to satisfy priority claims. Officers and a new Board of Directors were elected to take over operations.

The Bankruptcy Court in approving the plan notes that:

"[L]iquidation in bankruptcy * * would not realize enough money to pay the Chapter XI Receiver's Certificates, and it follows that general creditors would receive nothing in such a liquidation."

and that:

"[A]ny plan of reorganization will not provide for participation by the debtor's stockholders."

Under the amended plan of reorganization the United States claim was paid in full with interest.

However, operation of the remaining restaurants proved unprofitable and restaurant operations were discontinued by disposing of the restaurants over a period of time ending September 15, 1954.

Huyler's available cash reserves came from the three new investors mentioned above. On March 13, 1953, Huyler's bought all the stock of Basca Manufacturing Company, Inc., in order to acquire the assets of that company, for a purchase price of $2,600,000 of which $240,000 was paid in cash at the closing, the remainder to be paid over a period of about ten years through installments secured by specific liens and mortgages. The assets were all distributed to Huyler's on April 1, 1953. On May 28, 1953, Articles of Voluntary Dissolution of Basca Manufacturing Company, Inc., were filed. Huyler's moved its principal office to Indianapolis, Indiana, where Basca's plant was located.

Basca's outstanding capital stock consisted of 86 shares of common stock, 80½ of which were held by Basca's president, Gerald L. Canfield, who was employed as vice president by Huyler's. In 1957 he became president. His sister and his attorney held the remaining 5½ shares. When the three new investors sold their 48,000 shares in Huyler's in May and August 1954, 24,000 shares went to Mr. Canfield and members of his family. The rest went to Millard H. Pryor, members of his family, and trusts for his children. Mr. Pryor had been a director of Basca. In the fall of 1954 he became president of Huyler's, and in 1957 he was made chairman of the board when Mr. Canfield became president.

As of April 1, 1953, Huyler's had been manufacturing aluminum drinking vessels, shell projectiles and aluminum foil milk bottle caps. These were discontinued in November 1955, June 1956, and August 1958, respectively. From January 1956 to December 1957, Huyler's manufactured rib foil cups. From May 1956 through June 1957, Huyler's made components for the aircraft industry. Huyler's had bought all of the capital stock of an Indiana corporation, Twigg

Industries, which was manufacturing component parts for the aircraft industry and in August 1956, had liquidated and dissolved Twigg, taking over its operations. The Tax Court found that:

"A summary of Huyler's profits and net operating losses* for its fiscal years ended June 30, 1951 through 1955 (the amounts of which have been stipulated), is as follows:

| Fiscal year ended June 30 | Restaurant and candy operations | Basca division operations |
|---|---|---|
| 1951 | ($1,272,770.85) | ——— |
| 1952 | ( 1,574,801.80) | ——— |
| 1953 | ( 909,719.25) | $324,823.77 |
| 1954 | | 298,568.19 |
| 1955 | | ( 333,471.25)" |

*Figures in parentheses are losses.

———◆———

In its income tax returns for fiscal years 1956 and 1957, Huyler's claimed deductions for net operating loss carry-overs from 1951, 1952 and 1953. In the 1956 return a deduction was also claimed for a capital loss carry-over from 1952 and 1953 sustained in the sale of the stock of one of the candy factories.

The Commissioner of Internal Revenue disallowed these claimed deductions with the following explanation:

"(a) It is determined that the amounts * * * claimed as net operating loss deductions on your income tax returns for the fiscal years ended June 30, 1956 and June 30, 1957, are not allowable deductions under the provisions of Section 23(s) and 122 of the Internal Revenue Code of 1939 and Section 172 of the Internal Revenue Code of 1954 for the following reasons:

"(a) You are not the same taxpayer within the meaning of Section 122(b) (2) (B) of the Internal Revenue Code of 1939 for the purposes of carrying over against your income realized in the taxable years ended June 30, 1956 and June 30, 1957 from the manufacture and distribution of aluminum and metal products, net operating losses sustained by your predecessor in the conduct of a candy-making and restaurant business * * * for the taxable years ended June 30, 1951, June 30, 1952, and June 30, 1953, respectively.

\* \* \* \* \* \*

"(b) It is determined that the amount of $4,893.94 claimed as a short-term capital loss on your income tax return for the taxable year ended June 30, 1956 is not an allowable deduction because you are not the same taxpayer within the meaning of Section 117(e) of the Internal Revenue Code of 1939 and Section 1212 of the Internal Revenue Code of 1954 for the purpose of carrying over capital losses sustained in the taxable years ended June 30, 1952 and June 30, 1953 prior to the date you acquired the assets and business of Basca Manufacturing Company, Inc."

The Tax Court decided Huyler's petition for redetermination of the deficiency, as set forth in the Commissioner's notice, in favor of the Commissioner, and this petition for review followed.

Huyler's sets forth the contested issues as:

"1. Whether Petitioner's pre-Chapter X reorganization losses may be deducted from its post-reorganization profits, more particularly

whether the net operating losses incurred by Huyler's in its fiscal years ending June 30, 1951 and June 30, 1952, and the part of fiscal 1953 prior to December 2, 1952 (the date of consummation of Petitioner's Chapter X reorganization), may be carried forward and deducted from income realized after its Chapter X reorganization in its fiscal years ending June 30, 1954, June 30, 1956, and June 30, 1957, respectively.

"2. Whether Petitioner's post-Chapter X reorganization losses may be deducted from its post-reorganization income, more particularly whether the net operating loss incurred by Huyler's in its fiscal year ended June 30, 1953, after its reorganization on December 2, 1952, in the amount of $205,845.78 may be carried forward and deducted in determining federal income tax for Petitioner's next fiscal year ending June 30, 1954 (i. e. whether losses in the Relevant Period * may be deducted from profits during the Relevant Period).

"3. Whether Petitioner's capital losses in 1952 and 1953 may be carried forward and deducted in fiscal 1956, which issue is controlled by the decisions in 1 and 2 above and accordingly is not separately argued."

Huyler's takes the position that: (1) the statute is clear and unambiguous; (2) in imposing a tax on a "corporation" the statute provides a deduction based on that corporation's previous loss history; (3) the Tax Court applied an "extra-statutory" principle: continuity of business enterprise, which defeats Congressional intent to induce investment in risk enterprise and to prevent unequal tax burdens on corporations with alternating profits and losses; (4) application of this principle also defeats the objectives of Chapter X of the Bank-

ruptcy Act which seeks to avoid forced liquidation of insolvent corporate enterprises; (5) Congress never intended bankruptcy reorganization to affect adversely the net operating loss carry-over deductions of a reorganized company; (6) the Bankruptcy Act itself guards against abuse of such deductions by providing for objection by the Secretary of the Treasury if the plan of reorganization has for its principal purpose avoidance of taxes.

Further, Huyler's argues that although the original stockholders were all eliminated, the creditors, who in fact owned Huyler's were substituted as stockholders. In Huyler's view it was the loss of the creditors' involuntarily invested funds which generated the losses sought to be deducted. Thus Huyler's characterizes these creditors as "de facto" stockholders entitled to the same indirect benefits as regular stockholders under the carry-over provisions and not to be barred therefrom by a mere formal change in nominal stockholders in connection with the reorganization.

The Commissioner, on the other hand, takes the view that the subsequent metals manufacturing business is not entitled to carry over and deduct net operating losses of a former restaurant and candy making business realized in taxable years ending June 30, 1951 through June 30, 1953 against income of the new and different metals manufacturing business in taxable years ending June 30, 1954 and June 30, 1956 and June 30, 1957, when it was owned by entirely different shareholders. The Tax Court agreed that there was no continuity of business enterprise between the loss years and the years to which they were sought to be carried and that these deductions were barred by Libson Shops Inc. v. Koehler (1956), 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924.

Huyler's argues that the Tax Court misapplied the principles enunciated in

---

* December 2, 1952 to June 30, 1954. Huyler's stresses the fact that only the above mentioned transfer of 24% of the common stock occurred to change the ownership during this period. However the three new investors had disposed of all their financial interest in Huyler's by the end of August 1954.

that case. In Libson Shops a corporation resulting from a merger of 17 separately incorporated business, all selling women's apparel at retail, was not allowed to carry over and deduct the pre-merger net operating losses of three of its constituent corporations from post-merger income attributable to the other businesses (still selling women's apparel at retail). Huyler's seeks to distinguish Libson Shops on the ground that Huyler's is a continuing corporate entity offsetting its own prior losses against its own subsequent profits.

In Huyler's behalf, one must admit that there is no showing of any deliberate attempt, for example, to secure for the Basca shareholders a windfall deduction by grafting Basca's functions onto the moribund structure of Huyler's. The original shareholders of Huyler's were eliminated by operation of law and not by any contractual merger. Through the reorganization and the assumption of new operations, the creditors did receive some benefits which they would not otherwise have secured. The past United States tax liabilities were retired. New capital was attracted which permitted revitalization of a dying corporation into a new and vital element in the economy.

■ Nevertheless, we cannot adopt Huyler's theory that the Tax Court has resorted to an extra-statutory requirement to bar Huyler's from use of the deduction sought. We agree that the statute is clear and unambiguous. The taxpayer who suffers the loss and the taxpayer who carries over the deduction must be the same taxpayer.

We find most persuasive the reasoning in Norden–Ketay Corporation v. Commissioner, 2 Cir., 1963, 319 F.2d 902, page 906, cert. den. 375 U.S. 953, 84 S. Ct. 444, 11 L.Ed.2d 313, where the Court said:

"No intelligible legislative purpose would be served by permitting a substantially new group of shareholders engaged in a different enterprise to benefit from the losses sustained by earlier owners in another business.

In such a case, the corporate entity is the only link between them. The basic teaching of Libson Shops is that this is not enough. Decisions of the other Courts of Appeals in similar fact situations are in accord with this conclusion. [Citing cases]"

As in Norden-Ketay, shareholders of Basca, the purchased company, were permitted to acquire a substantial interest in Huyler's and to continue participation in management.

■ We are compelled to agree with the Tax Court that Libson Shops is applicable and that the statute is designed to permit a taxpayer to set off its lean years against its lush years only where the same taxpayer suffers the lean and enjoys the lush years. Apart from the old name, there was little left of Huyler's after the reorganization and acquisition of Basca's assets.

Huyler's would have us distinguish this case from Norden-Ketay on the ground that there 93% of the stock was held by new stockholders and that here 52% of the new stock went to creditors of the old company. This theory was considered and rejected in Wisconsin Central RR. Co. v. United States, Ct. of Claims, 1961, 296 F.2d 750, page 757, where the court analyzed the impact of Libson Shops on a situation where:

"In this reorganization the old stockholders were wiped out; they were no longer in the business; the new stockholders were some of the former creditors of the business. The same business was being carried on, but by a different group of people. Thus, continuing ownership is not present, * * *."

■ Huyler's also contends that its post-reorganization losses from restaurant activity at one location should be carried forward and deducted from post-reorganization profits of the next succeeding year in a new activity at a new location carried on, in part at least, concurrently. This argument is based on the assertion that during this period, no

change occurred in the capital structure and no substantial change in the ownership, the capital structure created on December 2, 1952 continuing unchanged through June 30, 1954, with no new directors. The terms of two which expired were not filled by election of successors. As to officers, Mr. Canfield was elected an additional vice president. All other officers continued unchanged. The Commissioner replies that the annual accounting principle applies to net operating loss deductions and Huyler's may not fragment its taxable year ending June 30, 1953. Burnet v. Sanford & Brooks Co., 282 U.S. 359, 363, 51 S.Ct. 150, 75 L.Ed. 383 (1931). Huyler's is here deducting $324,823.77 income from the new metals business (realized during the period from April 1, 1953 to June 30, 1953) from a loss of $530,669.55 sustained in its restaurant operations, during the period December 2, 1952 to June 30, 1953, although Huyler's income tax return was filed for the fiscal year July 1, 1952 to June 30, 1953.

Huyler's view is that it merely entered the metal business near the end of its loss year, while it continued to own a single restaurant until September 1954, without substantial change in ownership. The Commissioner regards the 24% shift in stock ownership as quite substantial enough. We must agree that 24% is more than the minor change in ownership of a loss corporation acquiring a new business enterprise as provided in Revenue Ruling 63-40, 1963-12 Int.Rev.Bull. 8, on which Huyler's relies. There the Internal Revenue Service stated that it would not rely on the rationale of Libson Shops to bar a corporation from carrying over losses against income from a new business enterprise because the losses were attributable to a discontinued corporate activity. There was a further limitation in that Ruling that the new enterprise be acquired by cash purchase of assets at their fair market value. That is not the case before us.

The capital loss deduction must be disallowed on the same grounds.

 A considerable part of Huyler's argument concerns Section 382(a) of the 1954 Code which imposes special limitations on net operating loss carry-overs, on purchase of a corporation and change in its trade or business. Section 382(a) applies by its terms to changes in ownership and character of business occurring on or after June 22, 1954.

We cannot agree that if Huyler's is not barred by these special limitations, it must of necessity meet the qualifications for an operating loss carry-over.

We have scrutinized with care all points and arguments advanced by Huyler's, but deem it unnecessary to comment on each in turn. We are satisfied that the decision of the Tax Court must be affirmed.

Affirmed.

