CONSOLIDATED-HAMMER DRY PLATE & FILM COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1872–64.   Filed December 6, 1967.

*Maurice P. Raizes*, for the petitioner.
*Nelson E. Shafer*, for the respondent.

---

156

160

## Issue 1. Net Operating Loss Carryover Deduction

The question presented is whether petitioner, Consolidated-Hammer, in computing its taxable income for its taxable years ended December 31, 1952, 1954, and 1955, was entitled to deduct, pursuant to sections 23(s) and 122 of the 1939 Code,[7] net losses sustained by Hammer in the latter's taxable years ended December 31, 1948, 1949, and 1950. The parties agree that under the relevant Code provisions, net operating loss deductions are not allowable unless there exists a continuity of business enterprise between the business which incurred the loss and the business which generated the income against which the carryover is claimed. *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382 (1957), rehearing denied 354 U.S. 943 (1957).

Respondent contends that the business in which the net operating losses were sustained was not, as the Court in *Libson Shops* stated, "substantially the same business" which gave rise to the income sought to be offset by the loss carryovers, and therefore the net operating losses are not deductible. Petitioner, on the other hand, contends that under the facts in this case, the two businesses were the same, and that the principle of *Libson Shops* does not apply.

In *Libson Shops*, 17 corporations were involved, their outstanding stock being owned by the same individuals in the same proportions. Sixteen of the corporations were engaged in the retail clothing business and the 17th rendered management services to the others. All

---

[6] The parties agree that in the event Consolidated-Hammer is entitled to carry over and deduct from its income any net operating losses sustained by Hammer in any of its calendar years 1948 through 1950, Consolidated-Hammer's net income for 1951 should be recomputed or otherwise adjusted and increased in the amount of $58,826.10, with respect to the foregoing inventory, to determine the proper net operating loss carryover deductions, if any, for the years in question, notwithstanding the fact that 1951 is otherwise barred for the assessment of taxes for said year by the statute of limitations in sec. 6501(a), I.R.C. 1954, and/or sec. 275(a), I.R.C. 1939.

[7] Sec. 23(s) of the 1939 Code provided that in computing net income there would be allowed as a deduction for any taxable year beginning after Dec. 31, 1939, the net operating loss deduction computed under sec. 122.

Sec. 122(b)(2) of the 1939 Code, as amended, provided, in part, as follows:

SEC. 122. NET OPERATING LOSS DEDUCTION.
.(b) AMOUNT OF CARRY-BACK AND CARRY-OVER.—
     *      *      *      *      *      *      *
  (2) NET OPERATING LOSS CARRY-OVER.—
     *      *      *      *      *      *      *
    (B) Loss For Taxable Year Beginning After 1949.—If for any taxable year beginning after December 31, 1949, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the five succeeding taxable years * * *

    (C) Loss For Taxable Year Beginning After December 31, 1947, and Before January 1, 1950.—If for any taxable year beginning after December 31, 1947, and before January 1, 1950, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the three succeeding taxable years * * *

17 corporations filed separate income tax returns. In 1949, the 16 sales corporations were merged into the managing corporation with the same shareholders continuing to control. Following the merger, the surviving corporation conducted the entire business as a single enterprise. Prior to the merger three of the sales corporations had net operating losses and in the year following the merger each of the retail units formerly operated by those three corporations continued to incur operating losses. In its income tax return for the year following the merger, the surviving corporation claimed deductions for the net operating losses of those three corporations. In holding that the claimed deductions were not allowable, the Supreme Court stated the following:

> The requirement of a continuity of business enterprise as applied to this case is in accord with the legislative history of the carry-over and carry-back provisions. Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year.[5] There is, however, no indication in their legislative history that these provisions were designed to permit the averaging of the premerger losses of one business with the postmerger income of some other business which had been operated and taxed separately before the merger. What history there is suggests that Congress primarily was concerned with the fluctuating income of a single business.[6]

> \*     \*     \*     \*     \*     \*     \*

> Petitioner is attempting to carry over the premerger losses of three business units which continued to have losses after the merger. Had there been no merger, these businesses would have had no opportunity to carry over their losses. \* \* \*

> \* \* \* The fact that § 129(a) is inapplicable does not mean that petitioner is automatically entitled to a carryover. The availability of this privilege depends on the proper interpretation to be given to the carryover provisions. We find nothing in those provisions which suggests that they should be construed to give a "windfall" to a taxpayer who happens to have merged with other corporations. The purpose of these provisions is not to give a merged taxpayer a tax advantage over others who have not merged. We conclude that petitioner is not entitled to a carryover since the income against the offset is claimed was not produced by substantially the same businesses which incurred the losses.[9]

In support of its position that the principle enunciated in *Libson Shops* does not apply, petitioner places particular reliance on the fact that the nature of the business remained the same, the owners of the business remained the same, the acquisition of Photo Engravers was for a bona fide business purpose, and the acquiring corporation was the loss corporation.

Petitioner's contention that the nature of the business remained the same, though probably the strongest factor in support of its position,

is subject to serious question. Prior to the 1951 merger, Hammer was engaged in the business of manufacturing photographic plates and film for the printing industry. As a result of the merger, Hammer acquired the assets of Photo Engravers, a company which manufactured and sold cameras and other equipment used in the photo-engraving and allied fields. Thereafter the development and sales efforts of both manufacturing companies were joined in a single enterprise. While it is true that the products manufactured by Hammer and Photo Engravers were, to a degree, complementary, those products were not necessarily of the same nature. However, even if we were to concede, as petitioner contends, that the taxpayer did not change the essential nature of its business as a result of the merger, there are other facts which convince us that a substantial change in the business occurred between the loss years and the years when petitioner sought to carry over those losses.

We think it significant that the operations of the former Hammer business continued to result in net operating losses from 1951 through 1955, so that by 1955, Hammer's business which was located in St. Louis was terminated and the assets of that business were sold, completely eliminating the former loss business from petitioner's operations. It is apparent that here, as in *Libson Shops*, no loss carryover would have been possible without a merger with a profit corporation inasmuch as Hammer's business never resulted in net operating profits subsequent to its loss years 1948 through 1950.

Petitioner's emphasis on the point that the merger was prompted by bona fide business reasons, including the necessary time in which to find a purchaser for its St. Louis business, is misplaced in the context of the issue presented. While consideration of such a fact would be relevant were we dealing with other provisions of the 1939 Code, for instance section 129, involving acquisitions made to avoid or evade income tax, the business reasons prompting the merger are immaterial in applying section 122. Here, the only question for our determination is whether the loss and profit corporations constituted "substantially the same business."

Equally misplaced is petitioner's emphasis on the fact that since, in the instant case, the surviving corporation was the loss corporation, whereas in *Libson Shops* the loss corporations were merged into the surviving corporation, the principle of *Libson Shops* is inapplicable. We have considered this argument in the past and concluded that merely because the loss corporation survives to claim the carryover, that fact will not present a bar to the application of the reasoning in *Libson Shops*. *Frank Ix & Sons Virginia Corp.*, 45 T.C. 533, 542 (1966), affd. 375 F. 2d 867 (C.A. 3, 1967), certiorari denied 389 U.S. 900 (1967); *Julius Garfinkel & Co.*, 40 T.C. 870, 877 (1963),

affd. 335 F. 2d 744 (C.A. 2, 1964), certiorari denied 379 U.S. 962 (1965).

In a further attempt to establish the existence of a continuity of business enterprise between the loss corporation and the income corporation, petitioner relies on the fact that the stockholders in the premerger corporation were the same as those in the postmerger corporation. In comparing the stockholders before and after the 1951 merger for the purpose of showing that no substantial change in the corporation took place, petitioner has unduly limited the period of time properly to be considered. If a change of corporate ownership is to be accorded weight in the determination of the issue before us, we think the appropriate period for comparing such ownership is the "interval between the years when the net operating losses were sustained and the years when petitioner has sought to deduct such losses." *Huyler's*, 38 T.C. 773, 784 (1962), affd. 327 F. 2d 767 (C.A. 7, 1964). Here, the losses in question were sustained by Hammer during the calendar years 1948 through 1950, and the calendar years at issue for which petitioner sought to deduct those losses were 1952, 1954, and 1955. The facts bearing on the interval between these two periods disclose that in early 1950 Hammer filed a voluntary petition for reorganization under chapter X of the Bankruptcy Act. On May 15, 1950, Sugarman proposed a plan of reorganization which, as approved, resulted in Sugarman acquiring 90 percent of Hammer's common stock, leaving the former owners of the business with only 10 percent. On August 31, 1951, Hammer, whose name had been changed to Consolidated-Hammer in November 1950, merged with Photo Engravers, a corporation which was wholly owned by Sugarman. Immediately after the merger, Sugarman owned 98.33 percent of Consolidated-Hammer's common stock, leaving the former Hammer stockholders with only 1.67 percent. It is apparent that there was a radical change in corporate ownership occurring in the interval between the years when the losses were sustained and the years when petitioner attempted to deduct those losses. Consistent with Sugarman's acquisition of more than 98 percent of the corporation's voting stock, and equally striking, is the change which occurred in the composition of Hammer's officers and directors between the period immediately prior to the 1950 reorganization and immediately following the 1951 merger. The record discloses that no officer or member of Hammer's board of directors prior to the 1950 reorganization was serving the corporation in an executive capacity subsequent to the 1951 merger, an interval of less than 16 months.

Inasmuch as changes in the corporation's capital structure are relevant in considering whether a substantial change in the corporation took place, *Huyler's*, *supra*, we think it significant to emphasize the

168

fact that between 1948 or 1949 and August 1951, the corporation underwent three recapitalizations. Prior to the loss years, 1948 through 1950, Hammer's authorized capital consisted of 200,000 shares of common stock having a par value of 50 cents per share. In 1948 or 1949, Hammer increased its authorized capital to 500,000 shares of common stock having a par value of 10 cents per share, of which 480,000 shares were issued. Subsequent to the 1950 reorganization, the authorized and issued common stock remained the same, although the corporation issued 1,000 shares of $100 par value preferred stock. Then, pursuant to the 1951 merger, the issued and outstanding common stock was increased sixfold to 2,880,000 shares having a par value of 10 cents per share, and the amount of preferred stock was reduced to 844 shares having a par value of $100 per share. These facts require the conclusion that significant changes in the corporation's capital structure occurred during the interval between the loss and profit years.

Thus, in the interval between the loss years and the years when petitioner claimed net operating loss deductions, (1) the character, if not the essential nature of the business was altered; (2) its name was changed; (3) in a 16-month interval between 1950 and August 1951, all the corporate officers and the entire board of directors were replaced; (4) in that same 16-month period a virtually complete change in stock ownership occurred; (5) the capital structure was materially changed as the result of three recapitalizations; and (6) the operations of the loss corporation were terminated and its assets sold. Given these changes we must conclude, as the Supreme Court did in *Libson Shops*, that—

petitioner is not entitled to a carry-over since the income against which the offset is claimed was not produced by substantially the same * * * [business] which incurred the losses.

### Issue 2(a).  Real Estate Tax Deductions

Petitioner maintained its books of account and reported income for the calendar year on the accrual basis. Pursuant to an agreement of sublease entered into by petitioner on or about June 1, 1953, it was required to pay, in addition to monthly rentals, all real estate taxes "charged, laid, levied or assessed" on the rental property during the term of the lease. On April 1 of the years in question a real property tax was imposed pursuant to the laws of Illinois on the property which constituted the subject of petitioner's leasehold, causing a lien to arise on the property as of that date. For the years in question, the Illinois Code provided that "The owner of property on the first day of April in any year shall be liable for the taxes of that year," [8] and the word

[8] Ill. Ann. Stat. ch. 120, sec. 509 (Smith-Hurd 1939).

"year" as used in the foregoing provision, meant a calendar year.[9] Under Illinois law, however, the taxes were not payable by the property owner until the following year,[10] at which time tax bills were issued. For the several years in question, petitioner claimed the deduction for real estate taxes in the year when the tax became a lien on the property even though the tax was not payable until the following year.

Respondent contends that although the lease agreement imposed upon petitioner the obligation of paying all real estate taxes levied upon the rental property, the amount so paid by petitioner constituted "additional rent" which was only deductible, as in the case of rent, when payable. Petitioner, on the other hand, contends that irrespective of whether the deduction is designated additional rent or real estate taxes, it was entitled to accrue the expense in the year when the lien attached.

Relevant regulations promulgated under both the 1939 and 1954 Internal Revenue Codes [11] provide:

Taxes paid by a tenant to or for a landlord for business property are additional rent and constitute a deductible item to the tenant and taxable income to the landlord, the amount of the tax being deductible by the latter.

To the same effect, see *Caroline T. Kissel*, 15 B.T.A. 1270, 1274 (1929). It is evident from the foregoing that insofar as it may be pertinent to the disposition of this issue, petitioner's deduction for real estate taxes must be treated as a rental expense.

It is now well established that under the accrual system of accounting, an item of expense may not be deducted until all the events have occurred which fix the taxpayer's liability. *United States* v. *Anderson*, 269 U.S. 422, 424 (1926); *Dixie Pine Co.* v. *Commissioner*, 320 U.S. 516 (1944). If petitioner is to prevail, we must find from the record that its liability for the real estate taxes in question became fixed in the year when the lien attached. Petitioner can derive no support for its position from the relevant State law since the liability which attached thereunder was specifically limited to the "owner of the property on the first day of April." Its liability is to be determined only by its sublease and the underlying basic lease to which it refers. While the sublease is silent on the question of when the lessee is required to pay taxes, the basic lease does provide that if the lessee fails to pay real estate taxes—

*when due,* Lessor shall have the right to pay the same, which amounts so paid are declared to be so much additional rent and payable with the installment of rent next due thereafter * * * [Emphasis supplied.]

If we are to accord the foregoing lease provision its obvious meaning, it seems necessary to conclude that, as between the parties, the lessee in-

---

[9] *Ibid.* sec. 482.
[10] *Ibid.* sec. 705.
[11] Sec. 39.23(a)–10(a), Regs. 118; sec. 1.162–11(a), Income Tax Regs.

curred no obligation to pay real estate taxes until they became due.

However, petitioner relies for support on the cases of *Denholm & McKay Co.*, 39 B.T.A. 767 (1939), and *Metropolitan Co.* v. *United States*, 176 F. Supp. 195 (S.D. Ohio 1959).

In *Denholm & McKay*, the petitioner, an accrual basis taxpayer whose fiscal year ended January 31, entered into a lease agreement which, for the taxable year at issue, required it to pay as rent (1) dividends on the preferred stock of the lessor if and when the lessor defaulted in making such payments, and (2) real estate taxes assessed by the City of Worcester, Mass., on certain rental property which it rented from a real estate company, all of whose common stock was owned by the petitioner. During its taxable year ended January 31, 1935, the year in controversy, the taxpayer-lessee paid $36,150.50 in dividends on the lessor's preferred stock. With respect to the taxes, the City of Worcester made a tax assessment of $56,112.40 on April 1, 1934, and an assessment of $56,222.08 on January 1, 1935. The former was payable on or before October 27, 1934, and the latter was payable one-half on July 1, 1935, and one-half on October 1, 1935.

Respondent contended as to both the dividend payment and the payment of taxes, that those expenditures were in the nature of capital investments which enhanced the value of petitioner's stock and for that reason were not deductible, and the amount so paid should be added to the cost of petitioner's stock. Petitioner, on the other hand, contended that the amounts so paid were rent, deductible as an allowable business expense.

The Court sustained petitioner's position on both items of expense and held, as to the real estate taxes, that petitioner, as an accrual basis taxpayer, could deduct the taxes as of the date of assessment, relying on the case of *H. H. Brown Co.*, 8 B.T.A. 112 (1927). In the *Brown* case, petitioner was an accrual basis taxpayer reporting income on the fiscal year ended June 30. On June 30, 1922, petitioner accrued Massachusetts State and local taxes by setting up an appropriate reserve on its books. The Massachusetts taxable year commenced on April 1 of each year, at which time the taxes became a lien even though the taxes were not due and payable until the following October. The taxes involved in the *Brown* case were of two classes—(1) direct taxes on real estate and personal estate, and (2) corporate excise taxes. For the taxable year in question, the real estate taxes were assessed to the person who was either the owner or possessor of the property and the taxes on personal estate were assessed to the owner in the town where he resided. In holding that petitioner properly accrued the taxes which were assessed as of April 1, 1922, and paid on September 26, 1922, the Court specifically recognized that the taxes in question "were liabilities of petitioner on April 1 of that year."

We think the *Brown* case stands for the proposition that an accrual basis taxpayer may deduct real estate taxes in the year when he becomes liable for such taxes, and not before. The taxpayer in *Brown* was not a lessee claiming a deduction for real estate taxes paid as additional rent but was the owner of the property in question and, as such, became personally liable for the taxes on the lien date, April 1. Inasmuch as the facts in *Denholm & McKay* fail to reveal specifically whether the petitioner-lessee in that case became primarily liable for the real estate taxes, because of the Court's reliance there on *Brown, supra*, we must assume that such was the fact. The case is for that reason distinguished from the case at bar.

We think the foregoing case analysis disposes of petitioner's reliance on *Metropolitan Co.* case, for in that case although the court allowed the petitioner-lessee to accrue real estate taxes as of the lien date, the Court specifically found that under applicable State law, the payment of the real estate taxes in question became an obligation of petitioner-lessee on the lien date. However, in the case at bar, since the applicable Illinois law specifically provided that "The owner of the property * * * shall be liable for the taxes of that year," it is clear that under applicable State law, petitioner incurred no liability for the real estate taxes on the lien date in question. Consequently, we must sustain respondent's determination and hold that petitioner was not entitled to accrue the amount of those taxes as additional rent until they became due and payable under the terms of its leasehold.

### *Issue 2(b). Validity of Bookkeeping Entries*

For the year 1955, real estate taxes were imposed on the leasehold property in the amount of $19,090.60, and under our holding in issue 2(a), *supra*, that amount, together with interest of $190.90, would ordinarily be deductible by petitioner as additional rent for the year 1956. While the parties have stipulated that such amounts were paid to the treasurer of Cook County in fulfillment of the tax obligation on the leasehold property in question, the only evidence suggesting that petitioner paid such amounts is contained in petitioner's books of account. Respondent contends that of the $19,281.50 paid as taxes in 1956, petitioner is entitled to deduct as additional rent expense only $1,610.41 on the ground that the balance ($17,671.09) arose from an unexplained adjusting entry to petitioner's books and records.

After considering all the facts in the record bearing on this issue, we find that petitioner has failed to adequately substantiate the underlying bookkeeping entries which make up the adjusting entry in question. We must therefore sustain the presumption of validity to which respondent's disallowance is entitled, and hold that for the year 1956,

petitioner was only entitled to deduct $1,610.41 for real estate taxes paid as an additional rental expense.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

RAUM, *J.*, concurs in the result.

———

TANNENWALD, *J.*, dissenting in part: I think the majority opinion correctly sets forth the general test of deductibility but then misapplies it to the facts of this case.

The findings of fact contained only a partial quotation of the applicable provision of the basic lease, which was specifically incorporated by reference in the sublease. The full provision is as follows:

7. Lessee will pay, in addition to the rent above specified, all water rents, gas and electric light and power bills and all real estate taxes, charges, and assessments, and governmental impositions in lieu of or in substitution for real estate taxes, charges, or assessments, which shall or may during the term of this lease be charged, laid, levied or assessed on said demised premises, *insofar as and to the extent that, the same pertains to the period of this lease,* or any extension thereof, and which shall be due and payable during the term of this lease, and in case said water rents, bills for gas, electric light and power and real estate taxes, charges, and assessments, and such governmental impositions shall not be paid when due, Lessor shall have the right to pay the same, which amounts so paid are declared to be so much additional rent and payable with the installment of rent next due thereafter, provided, however, that nothing herein shall prevent Lessee from contesting, protesting or reviewing by legal proceedings, or in such other manner as may be legal, in Lessor's name or otherwise (which, if instituted, shall be conducted at Lessee's own expense) any tax, water rent or utility bill or other such governmental imposition. (Emphasis added.)

The words "and which shall be due and payable during the term of this lease" were obviously stricken from the original draft of the basic lease and such action was initialed by the parties to that lease.

The lien date was April 1. The tax year was the calendar year. By December 31, the petitioner had been in possession of the leased premises for all or part of the calendar year, and the precise amount of the tax attributable to its period of occupancy had been fixed. Thus, the taxes had been "charged, laid, levied or assessed" and they clearly met the requirement that they "[pertain] to the period of [the] lease." Consequently, all of the events had occurred to fix petitioner's liability. That the determination of its liability was not postponed until the following year, when the taxes became "due and payable," is self-evident from the fact that the language specifically providing for such postponement had been excised from the basic lease.[1]

---

[1] It appears that, in the first year of the sublease, petitioner paid amounts representing taxes attributable to the presublease period. The record is not clear in this regard and, in any event, it does not seem that such action in and of itself should be deemed sufficient to overcome the clear language of the agreement.

As far as *Denholm & McKay Co.*, 39 B.T.A. 767 (1939), is concerned, I disagree that it is distinguishable simply on the ground that the petitioner therein was "primarily liable" for the real estate taxes. The fact of the matter is that, in that case, the issue before the Court was capitalization versus expense of the amount representing taxes and the question of the *time of accrual* of the obligation to pay that amount was not in dispute.

On the basis of the foregoing, I would hold that the petitioner is entitled to deduct, for each calendar year or part thereof, an amount equal to the taxes attributable to the period of petitioner's occupancy.

TIETJENS and HOYT, *JJ.*, agree with this dissent.

---

SIMPSON, *J.*, dissenting in part: I must disagree with the conclusion of the majority regarding the deductibility of the taxes paid by the taxpayer. I agree that the payment of these taxes is a form of additional rent and that the answer to the question turns on the interpretation of the lease. However, I disagree with the majority's interpretation of the lease.

Since this taxpayer used the accrual method of accounting, the question is when did it incur the liability to pay the taxes—not when were such taxes to be paid. There are pertinent portions of the lease that were not quoted in the majority's opinion. The full paragraph 7 provides:

7. Lessee will pay, in addition to the rent above specified, all water rents, gas and electric light and power bills and all real estate taxes, charges, and assessments, and governmental impositions in lieu of or in substitution for real estate taxes, charges, or assessments, which shall or may during the term of this lease be charged, laid, levied or assessed on said demised premises, insofar as and to the extent that, the same pertains to the period of this lease, or any extension thereof, ~~and which shall be due and payable during the term of this lease~~; and in case said water rents, bills for gas, electric light and power and real estate taxes, charges, and assessments, and such governmental impositions shall not be paid when due, Lessor shall have the right to pay the same, which amounts so paid are declared to be so much additional rent and payable with the installment of rent next due thereafter, provided, however, that nothing herein shall prevent Lessee from contesting, protesting or reviewing by legal proceedings, or in such other manner as may be legal, in Lessor's name or otherwise (which, if instituted, shall be conducted at Lessee's own expense) any tax, water rent or utility bill or other such governmental imposition.

It seems clear to me that this paragraph imposed a liability upon the taxpayer when the taxes were assessed. The obligatory part of the paragraph states that the lessee shall pay all real estate taxes "which shall or may during the term of the lease be charged, laid, levied or assessed on said demised premises." Thus, under this language, the obligation arose when the taxes were assessed during the lease. Such interpretation is reinforced by the provision that the obligation applies to real estate taxes "insofar as and to the extent that, the same

pertains to the period of this lease." In addition, the real estate taxes are treated in the same manner as the payments for "water rents, gas and electric light and power bills." If our question concerned the water rents or the gas and electric bills to be paid by the lessee, it seems clear that the lessee's obligation applied to the water, gas, and electricity that it used during the lease—and not to those bills which happened to come due during the lease. Finally, the lease as originally drawn apparently restricted the lessee's obligation to those amounts "which shall be due and payable during the term of this lease"; however, this phrase was stricken from the lease, and the modification was initialed by the parties. This change in the terms of the lease makes it abundantly clear that the parties considered the question and decided that the obligation did not apply merely to those payments which became due during the lease. Taking all these circumstances into consideration, I am convinced that the lessee's liability arose when the taxes were assessed.

The majority's interpretation rests in part on the provision relating to what happens if the lessee does not make the required payments. In my opinion, this provision merely sets forth a procedure under which the lessor can protect his interest in the property by making the payments when the lessee fails to perform his obligation. This provision did not establish the lessee's liability, nor fix the time when such liability was incurred.

There is some evidence that during the first year of the lease, the parties understood the obligation to apply to the taxes that became due at that time. Although this understanding of the parties is pertinent in interpreting the lease, it does not overcome what I consider to be the clear meaning of the terms of the lease.

TIETJENS and HOYT, *JJ*., agree with this dissent.