409 F.2d 1077
 CONSOLIDATED-HAMMER DRY PLATE & FILM COMPANY, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
COMMISSIONER OF INTERNAL REVENUE, Petitioner,
v.
CONSOLIDATED-HAMMER DRY PLATE & FILM COMPANY, Respondent.
 No. 16950.
 No. 17024.
 United States Court of Appeals Seventh Circuit.
 April 14, 1969.
 
 1
 Maurice P. Raizes, Chicago, Ill., for Consolidated-Hammer.
 
 
 2
 Mitchell Rogovin, Jonathan S. Cohen, Attys., Tax Division, Department of Justice, Lester R. Uretz, Internal Revenue Service, Washington, D. C., Lee A. Jackson, Marco S. Sonnenschein, Attys., Department of Justice, Washington, D. C., for C. I. R.
 
 
 3
 Before SWYGERT and KERNER, Circuit Judges, and GORDON, District Judge.[1]
 
 
 4
 MYRON L. GORDON, District Judge.
 
 
 5
 This is an appeal by Consolidated-Hammer from a decision of the Tax Court. The Commissioner of Internal Revenue has filed a cross-appeal.
 
 
 6
 The three issues presented for consideration are: (1) whether losses incurred in this case prior to a merger may be deducted as a loss carryover by the taxpayer in the years following the merger; (2) whether the appellant, an accrual basis taxpayer, may deduct real estate taxes in the year the taxes became a lien on the property or in the subsequent year when such taxes became payable; and (3) whether the appellant was entitled to deduct $16,671.09 as a real estate tax expense for its taxable year 1956.
 
 I. THE LOSS CARRYOVER
 
 7
 Hammer Dry Plate & Film Company (hereinafter referred to as Hammer) was engaged in the business of manufacturing photographic plates and film for the printing industry. Hammer's operations resulted in a loss of $112,114.53 in 1948; $99,959.62 in 1949; and $126,550.87 in 1950.
 
 
 8
 In May, 1950, Benjamin Sugarman (who had not previously been a shareholder) proposed a plan of reorganization for Hammer, which was approved by the court in the latter part of the year. Pursuant to that plan, shareholders of Hammer surrendered 432,000 of their 480,000 shares of common stock. Mr. Sugarman then purchased the available 432,000 common shares (plus 500 of certain preferred shares) for a total price of $50,000. Thus, Sugarman became the owner of 90 percent of Hammer's common stock. Subsequent to the reorganization, the composition of the board of directors changed completely, and only one officer was retained by the reorganized corporation.
 
 
 9
 In November, 1950, Hammer's name was changed to Consolidated-Hammer Dry Plate & Film Company.
 
 
 10
 Consolidated Photo Engravers & Lithographers Equipment Company (hereinafter "Photo Engravers"), which manufactured and sold cameras and other photoengraving equipment, was owned entirely by Mr. Sugarman and his wife. This company showed a profit in 1948, 1949 and 1950.
 
 
 11
 Photo Engravers and Consolidated-Hammer merged on or about August 31, 1951. Consolidated-Hammer was the surviving corporation; it is the plaintiff in this action. After the merger, Consolidated-Hammer's capitalization consisted of 2,880,000 shares of common stock and 844 shares of nonvoting preferred, all of which was issued as follows:
 
 
 12
 a) to shareholders of Hammer: one share of common for each share of Hammer common and one share of preferred for each share of Hammer preferred.
 
 
 13
 b) to shareholders of Photo Engravers: 4800 shares of the merged corporation for each share of Photo Engravers.
 
 
 14
 Sugarman therefore owned 98.33 percent of the merged corporation (432,000 as a Hammer shareholder and 2,400,000 as a Photo Engraver shareholder). All of Hammer's other shareholders held only 1.67 percent of the new company.
 
 
 15
 Subsequent to the merger, Consolidated-Hammer maintained accounts to reflect separately the results from former Hammer activities and former Photo Engraver activities. This segregated book-keeping account showed that in the years 1951 through 1954 the Hammer operations resulted in losses and the Photo Engraver division made profits. In 1955 Hammer had a profit from the sale of its assets while Photo Engravers suffered a loss. The net operating results for the petitioner (disregarding the claimed loss deductions) were gains in 1951, 1952, 1954 and 1955 — and a loss in 1953.
 
 
 16
 Consolidated-Hammer's returns for 1951 and 1952 utilized net operating loss deductions of $215,957.53 for 1951 and $122,667.49 for 1952. The deductions claimed resulted from the losses incurred by Hammer in 1948 through 1950. No loss deduction was taken in the corporation's 1953 return, but in 1954 and 1955 Consolidated-Hammer again claimed net operating loss carryover deductions resulting from losses incurred by Hammer in the years prior to the merger.
 
 
 17
 The Commissioner disallowed the above-mentioned operating loss carry-over deductions and served upon it a statutory notice of deficiency. We are concerned here, as was the Tax Court, only with the loss carryover deductions claimed for the taxable years 1952, 1954, and 1955.
 
 
 18
 Under the authority of the continuity of business enterprise test formulated in Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957), reh. den. 354 U.S. 943, 77 S.Ct. 1390, 1 L.Ed.2d 1542 (1957), the Tax Court held that the losses suffered by Hammer in the years 1948-1950 could not be deducted by this plaintiff in 1952, 1954, and 1955.
 
 
 19
 The applicable statutory section provides that "if for any taxable year . . . the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for [a certain number of years]". 1939 Internal Revenue Code § 122(b). Quite plainly, a deduction is permitted only by the taxpayer that incurred the loss. Huyler's v. C. I. R., 327 F.2d 767 (7th Cir. 1964).
 
 
 20
 This section was interpreted in Libson Shops, Inc. v. Koehler, supra, in which the Court set down the test that after a merger the taxpayers are not to be considered as the same unless there exists a "continuity of business enterprise" between the loss corporation and the corporation claiming the deduction.
 
 
 21
 In Libson Shops, seventeen corporations were involved, their outstanding stock being owned by the same individuals in the same proportions. Sixteen of the corporations were engaged in the retail clothing business, and the seventeenth rendered management services to the others. All seventeen filed separate tax returns. In 1949, the sixteen retail firms were merged into the management corporation, with the same shareholders remaining in control. Following the merger, the single corporation conducted the entire business formerly handled by the seventeen corporations individually. Prior to the merger, three of the sales corporations had operated at a loss, and in the year following the merger, each of them continued to show a loss. The surviving corporation attempted to deduct the losses which those three units had incurred prior to the merger. The deductions were disallowed, the Court stating that:
 
 
 22
 "The requirement of a continuity of business enterprise as applied to this case is in accord with the legislative history * * *. There is * * * no indication * * * that these provisions were designed to permit the averaging of the pre-merger losses of one business with the post-merger income of some other business which had been operated and taxed separately before the merger. What history there is suggests that Congress primarily was concerned with the fluctuating income of a single business.
 
 
 23
 * * * * * *
 
 
 24
 "Petitioner is attempting to carry over the pre-merger losses of three business units which continued to have losses after the merger. Had there been no merger, these businesses would have had no opportunity to carry over their losses.
 
 
 25
 * * * * * *
 
 
 26
 "The purpose of these provisions is not to give a merged taxpayer a tax advantage over others who have not merged. We conclude that petitioner is not entitled to a carry-over since the income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses." Id. at 386-390, 77 S.Ct. at 993-994.
 
 
 27
 A striking similarity between the present situation and Libson Shops is that in both cases the business which lost the money continued to do so after the merger and during the years in which the deductions were claimed. Thus, the Hammer operations, as reflected in the taxpayer's books, continued to show a loss until the Hammer assets were sold in 1955. Therefore, as in Libson Shops, it is obvious that there could not have been a deduction if there had been no merger.
 
 
 28
 There are other factors present in this case which also tend to contradict the petitioner's claim that the taxpayer that incurred the losses is the same taxpayer that claimed the deduction. The 1951 merger also changed the essential nature of the corporation's business, a meaningful factor in evaluating the claim to a deduction. See Norden-Ketay v. C. I. R., 319 F.2d 902 (2d Cir. 1963); Mill Ridge Coal Co. v. Patterson, 264 F.2d 713 (5th Cir. 1959).
 
 
 29
 Hammer, the loss corporation, was engaged in the business of manufacturing photographic plates and films for the printing industry. Photo Engravers, whose profits permitted the deductions, manufactured and sold cameras and other equipment used in the photoengraving and allied fields. While the businesses are to some extent complementary, they do not possess the element of continuity required by Libson Shops; the deductions were disallowed in Libson Shops, even though the corporations in that case were involved in essentially the same business. Dissimilarity of enterprise is even more apparent where, as here, the profits were generated by a business significantly different than that which incurred the losses.
 
 
 30
 Even though not present in Libson Shops, another factor to be considered by the court is whether there has been a significant change in ownership in the "interval between the years when the net operating losses were sustained and the years when petitioner has sought to deduct such losses." Huyler's, 38 T.C. 773, 784 (1962), aff'd 327 F.2d 767 (7th Cir. 1964). We have such a change in this case.
 
 
 31
 Most of the losses were sustained by Hammer prior to Mr. Sugarman's entry into the picture; when the deductions were claimed, he owned over 98 percent of the stock. Although by itself not controlling, this change in ownership is a factor to be considered in deciding whether the taxpayers are the same. See Huyler's v. C. I. R., 327 F.2d 767 (7th Cir. 1964); Norden-Ketay Corp. v. C. I. R., 319 F.2d 902 (2d Cir. 1963). But cf. Libson Shops v. Koehler, supra; Allied Central Stores, Inc. v. C. I. R., 339 F.2d 503 (2d Cir. 1963), cert. den. 381 U.S. 903, 85 S.Ct. 1447, 14 L.Ed.2d 285, reh. den. 381 U.S. 956, 85 S.Ct. 1801, 14 L.Ed.2d 729.
 
 
 32
 We are not persuaded by petitioner's contention that although the percentages of stock holdings changed drastically, the deductions should be permitted because the original stockholders retained an interest. The latter's interest was less than two percent, so for all practical purposes, Mr. Sugarman owned the entire company when the deductions were claimed; he had no interest in Hammer when the great bulk of the losses occurred. Thus, we have another indication that the petitioner and Hammer were different taxpayers.
 
 
 33
 The petitioner asserts that it should be entitled to deduct those losses occurring during the final months of 1950, after Mr. Sugarman had become a majority stockholder in Hammer. This assertion might give us reason to pause if this was the only reason we thought the deduction was barred by the rule in Libson Shops. However, we have already noted that we rely on several other factors, and thus the plaintiff can gain no deduction, even though there were a few months of losses which took place after Mr. Sugarman owned stock in 1950.
 
 
 34
 The taxpayer advances three additional points: (1) the same actual taxpayer that incurred the losses earned the profits being offset; (2) the acquiring corporation was the loss corporation; and (3) the acquisition was for a bona fide business purpose.
 
 
 35
 The first two factors can be handled together. The petitioner is, in effect, contending that because the acquiring corporation is the corporation which had sustained the losses, it is the same taxpayer and therefore entitled to the deduction. This argument is without merit. See Julius Garfinckel & Co. v. Commissioner of Internal Revenue, 335 F.2d 744 (2d Cir. 1964), cert. den. 379 U.S. 962, 85 S.Ct. 651, 13 L.Ed.2d 556; Frank IX & Sons Virginia Corp. v. Commissioner of Internal Revenue, 375 F.2d 867 (3d Cir. 1967), cert. den. 389 U.S. 900, 88 S.Ct. 215, 19 L.Ed.2d 217. This is an artificial distinction which places form before substance.
 
 
 36
 The third point advanced by the plaintiff is also not persuasive. The question of tax avoidance versus business purpose is not at issue in a Libson Shops situation. As pointed out in that case, another section of the 1939 Code disallows deductions when the acquisition of corporate property is for the principal purpose of tax evasion. See 1939 Internal Revenue Code § 129(a). "The fact that Section 129(a) is inapplicable does not mean that petitioner is automatically entitled to a carry-over." Libson Shops v. Koehler, supra, 353 U.S. at 389, 77 S.Ct. at 994.
 
 
 37
 For the reasons stated above, the Tax Court correctly disallowed these deductions.
 
 II. THE REAL ESTATE TAX DEDUCTION
 
 38
 The second issue is whether real estate taxes paid by petitioner, an accrual basis taxpayer, were deductible in the year in which the taxes became a lien on the property or in the subsequent year in which they were payable.
 
 
 39
 Pursuant to an agreement of sublease entered into on June 1, 1953, petitioner, as tenant, was required to pay, in addition to monthly rental, all real estate taxes "charged, laid, levied or assessed" on the rental property. The sublease further provided that the sublease shall be "subject and subordinate to all provisions of the basic lease. * * *" The basic lease provided, in part:
 
 
 40
 "7. Lessee will pay, in addition to the rent above specified, all water rents, gas and electric light and power bills and all real estate taxes, charges, and assessments, and governmental impositions in lieu of or in substitution for real estate taxes, charges or assessments, which shall or may during the term of this lease be charged, laid, levied or assessed on said demised premises, insofar as and to the extent that, the same pertains to the period of this lease, or any extension thereof, and which shall be due and payable during the term of this lease, and in case said water rents, bills for gas, electric light and power and real estate taxes, charges, and assessments, and such governmental impositions shall not be paid when due, Lessor shall have the right to pay the same, which amounts so paid are declared to be so much additional rent and payable with the installment of rent next due thereafter, * * *" (emphasis added)
 
 
 41
 Under Illinois law, real estate taxes become a lien on property as of April 1 of any given year, and the Illinois Code provides that "the owner of property on the first day of April in any year shall be liable for the taxes of that year. * * *" Ill.Ann.Stat. ch. 120, § 509 (Smith Hurd 1939). However, even though a lien arises, these taxes are not payable by the owner until the following year when the tax bills are issued.
 
 
 42
 For the several years in question, the plaintiff deducted from its income taxes on the property in the year the lien was imposed. The Commissioner disallowed this deduction. The Tax Court agreed with the Commissioner and held that the taxpayer was entitled to deduct these taxes only in the year of payment. We think a proper reading of the lease shows the Tax Court's conclusion to be correct.
 
 
 43
 Under the accrual system of accounting, an expense is deductible only when all events have occurred which finally fix the taxpayer's liability. United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926). Petitioner contends that its liability became fixed for each year's taxes on the preceding April 1st, when the lien was imposed. The applicable law gives no help to the petitioner. As pointed out by the Tax Court, that lien is specifically limited to the "owner of the property". Since the sublease is silent on when the sublessee's liability becomes fixed, we must examine the underlying lease to find the answer to this issue.
 
 
 44
 The basic lease provides that, in addition to rent, the lessee will pay all real estate taxes which shall or may be assessed during the term of the lease, but, "in case said * * * taxes * * * shall not be paid when due, Lessor shall have the right to pay the same, which amounts so paid are declared to be so much additional rent and payable with the installment of rent next due thereafter. * * *"
 
 
 45
 By virtue of this clause, no obligation is imposed on the petitioner to pay the real estate taxes until the tax bills are issued in the following year.
 
 
 46
 The taxpayer points to the stricken portion of the lease provision quoted above and contends that the striking of these words indicates that the parties to the lease expressly did not want the liability of the taxpayer to be postponed to the year when the taxes were payable. We disagree with this conclusion. We think it more reasonable to believe that the intent of the parties in striking the language was to insure that the lessee would ultimately be responsible for the real estate taxes.
 
 
 47
 Because of our decision on this issue, the cross-appeal of the Commissioner, taken for protective purposes, is rendered moot.
 
 III. THE 1956 REAL ESTATE TAX DEDUCTION
 
 48
 In 1955, real estate taxes totalling $19,281.50 were imposed upon the property subleased by the petitioner. These tax payments would ordinarily be deductible by it in 1956. There is no doubt that these taxes were, in fact, paid; but a problem arose because the taxpayer, in computing its profit and loss, erroneously deducted only $1,610.41 in taxes, rather than the actual taxes paid. The Commissioner disallowed the petitioner's effort to deduct an additional $17,671.09 for taxes paid because of the presence of an unexplained journal entry on petitioner's books. We are unable to determine, from the petitioner's entries, whether the balance of the taxes paid was added to various other expense items, and the taxpayer has not been able to clarify the erroneous adjusting entry.
 
 
 49
 Since this journal entry, and the deduction taken as a result of it, remain unexplained, the Commissioner disallowed what may have been in reality a second deduction for the same expense. The Tax Court sustained the Commissioner's disallowance, relying on the presumption of validity accorded the Commissioner's actions. Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933).
 
 
 50
 We agree with the Tax Court that the Commissioner's determination must stand. We have no way of knowing whether the adjusting entry did or did not fully encompass the real estate deduction. No further deduction could be permitted under these circumstances.
 
 
 51
 Accordingly, the decision of the Tax Court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The writer of this opinion is sitting by designation from the United States District Court for the Eastern District of Wisconsin